Lisa BAKER, et al., Appellants,

v.

Ernie FLETCHER, in his Official Capacity as the Governor of the Commonwealth of Kentucky, Appellee.

No. 2005–SC–000208–TG.

Supreme Court of Kentucky.

June 15, 2006.

Rehearing Denied Nov. 22, 2006.

Ron Parry, Parry, Deering, Futscher & Sparks, PSC, Covington, Phillip J. Shepherd, Frankfort, Counsel for Appellants.

James L. Deckard, General Counsel, Office of the Governor, Frankfort, Sheryl G. Snyder, M. Holliday Hopkins, Jason Patrick Renzelmann, Frost Brown Todd LLC, Louisville, Counsel for Appellee.

Opinion of the Court by Chief Justice LAMBERT.

The question before this Court is whether the General Assembly may retroactively suspend KRS 18A.355, a statute that provides all employees of the Commonwealth of Kentucky an annual increment in their salaries of not less than five percent. The trial court answered in the affirmative. A notice of appeal was filed and this Court granted transfer of the appeal.[1]

## FACTS

The facts, as well-stated by the able trial court, are as follows.

In August of 2004, the Plaintiffs, Lisa Baker, Jeffrey Howard, John Meehan, and Stanley C. Nickell, filed this class action complaint in the Franklin Circuit Court, requesting declaratory and injunctive relief pursuant to KRS 418.040 and CR 57, against the named Defendant Ernie Fletcher, in his official capacity as Governor of Kentucky.

The origin of the Plaintiffs' complaint emerges from the Kentucky General Assembly's failure to fulfill its constitutional and statutory duty to enact a comprehensive balanced budget appropriating revenues to fund the Executive Branch. As a result of the General Assembly's neglect and in the absence of a budget appropriation, then Governor Paul E. Patton declared a state of emergency and issued an Executive Order (2002–727) for the fiscal year beginning July 1, 2002. Pertinent to the case at hand, Governor Patton's Executive Spending Plan contained language seeking to suspend operation of KRS 18A.355(1) and alternatively provide for a two and seven-tenths (2.7%) annual salary increment for state employees.

The 2003 regular session of the General Assembly proved to be more productive; and on March 25, 2003, the Legislature promulgated a biennial budget for the fiscal year beginning July 1, 2002 and ending on June 30, 2003, and for the fiscal year beginning July 1, 2003, and ending on June 30, 2004. The enacted budget bill also contained language suspending KRS 18A.355(1) and providing a cost-of-living adjustment of two and seven-tenths percent (2.7%) for the fiscal year 2002–2003 on the base salary or wages of each eligible state employee on their anniversary date.

The crux of the Plaintiffs' complaint focuses on the interim period (July 1, 2002 to March 25, 2003) in which the Executive Branch of the Commonwealth was funded solely from the Executive Order of Governor Patton. During this time period, the named Plaintiffs were all state employees, each having their annual increment dates fall between July 1, 2002 and March 25, 2003. Pursuant to the Executive Order, the Plaintiffs received a two and seven-tenths (2.7%) annual increment. They main-

---

1. CR 74.02.

tain, however, that they were entitled to a full five percent (5%) annual increment as provided under KRS 18A.355(1).

The Plaintiffs now seek declaratory and injunctive relief requiring the Defendant to implement a full five percent (5%) salary increase for them and all similarly situated state employees under KRS 18A.355 for the fiscal year beginning July 1, 2002. In support, the Plaintiffs maintain that the Governor was without authority to suspend the statutory mandates of KRS 18A.355(1) and an Executive Order attempting otherwise represents a violation of Section 15 and Section 81 of the Kentucky Constitution. The Plaintiffs further assert that they are entitled to an upward adjustment in their base salary and/or retirement benefits for each fiscal year after the adoption of the Executive Order to reflect the increased salary to which they claim they are entitled.

## DISCUSSION OF THE LAW

 It is beyond dispute that the General Assembly possesses power to suspend statutes. Section 15 of the Kentucky Constitution states that "[n]o power to suspend laws shall be exercised unless by the General Assembly or its authority." This section, like the majority of the Kentucky Bill of Rights,[2] was modeled after a similar provision in the Pennsylvania Constitution,[3] and was originally designed to reflect the will of the framers to prevent suspension of duly-enacted laws by any entity other than the constitutionally-elected legislative body, a power the British government had ruthlessly exercised over the colonies.[4] Prevailing precedent of this Court provides that the General Assembly may also suspend statutes in a budget bill.[5] Moreover, the General Assembly may *retroactively* suspend statutes in some circumstances, provided that the legislature clearly manifests its intent to do so.[6] These principles of Kentucky jurisprudence, while instructive, fall short of resolving the case before us, as it calls into question whether the General Assembly may retroactively suspend the salary-increment statute in the middle of a budget cycle, after employee rights may have become vested.

The parties agree that actions relevant to the adjudication of this case were taken by the General Assembly. Counsel for Appellants began his oral argument by informing the Court that this case was about "[w]hether state employees who have a statutory right to a five percent pay raise can have that statutory right retroactively revoked by implication of ambiguous language in a subsequently enacted budget." Similarly, the Governor's counsel posited that "[t]he question before this Court is not the validity of Governor Patton's executive order. The question before this Court is the validity of an act of the General Assembly subsequent to that executive order." Thus, the parties agree that the legal issue is the scope of legislative authority.

 But this claim was brought against the Governor, one who took no authorized action in the case. The General Assembly retroactively suspended the statute, and

---

**2.** The Bill of Rights is enumerated in sections 1 through 26 of the Constitution of Kentucky.

**3.** Pa. Const. of 1790, Art. IX, § 12. Today that provision is found in art. 1 § 12 of Pennsylvania's constitution.

**4.** *See* Robert M. Ireland, *The Kentucky State Constitution: A Reference Guide* 39 (1999).

**5.** *Armstrong v. Collins,* 709 S.W.2d 437, 441–43 (Ky.1986).

**6.** KRS 446.080(3). *See also Commonwealth v. Vinson,* 30 S.W.3d 162 (Ky.2000); *Vandertoll v. Commonwealth,* 110 S.W.3d 789 (Ky.2003).

we have discovered no means whereby the Governor could have properly accommodated Appellants' claims. It is axiomatic that a plaintiff may not obtain relief from one who did him no wrong.[7] However, further analysis is appropriate to explain why relief cannot be adjudged against the Governor and to address lingering questions as to who are proper parties in cases of this type.

■ The Governor appears to have been named as the defendant because the Appellants asserted that his action in suspending KRS 18A.355 in his Executive Spending Plan violated their right to the annual increment. However, *Fletcher v. Commonwealth*[8] is dispositive of this contention.

> The Governor possesses no "emergency" or "inherent" powers to appropriate money from the state treasury that the General Assembly, for whatever reason, has not appropriated.... Nor does the Court of Justice have the power to confer such authority.

We also held that Governor Patton was not empowered to suspend statutes.

> The suspension of statutes by a Governor is also antithetical to the constitutional duty to "take care that the laws be faithfully executed." Ky. Const. § 81. A fortiori, the suspension of any statutes by the Governor's Public Services Continuation Plan was unconstitutional and invalid ab initio.

Therefore, Governor Patton's attempted suspension of the statute in the Executive Order was void *ab initio*, and no damages could have resulted from that legal nullity. Even if one assumes that Appellants' theory is correct that the retroactive suspension of the statute improperly divested them of vested rights, Appellants were nevertheless obligated to bring their claims against parties whose actions caused their damages. Logically that party would be the General Assembly, since it was its retroactive suspension of the five percent statute that makes up this controversy.

■ However, in matters concerning the General Assembly, Section 43 of the Kentucky Constitution grants privileges and immunities to its members—such that they shall not be questioned in any court for speech or debate in either House— therefore, no member, nor the body, can be held to account for suspension of the statute. This Court is required to determine whether the suspension was lawful, but the privileges and immunities clause prevents a plaintiff from seeking redress from members. This is not a novel rule of law; rather it is consistent with cases interpreting the United States Constitution. And, as will be seen, this is as it should be.

The constitutional privileges granted to members of the Kentucky General Assembly mirror word-for-word the privileges granted to members of the Congress of the United States in the Speech and Debate Clause.[9] In fact, the privilege is a century older than our federal constitution, dating at least to the time of the English Bill of

---

7. *E.g., Miles v. Lee*, 284 Ky. 39, 143 S.W.2d 843, 852 (1940) ("a controversy, in order to be judicially determined, must exist between the parties having a direct interest in the subject matter of the controversy"). *See also* 59 Am.Jur.2d *Parties* §§ 1, 51, and 52 (2002).

8. 163 S.W.3d 852 (Ky.2005).

9. Section 43 of the Constitution of Kentucky states that "for any speech or debate in either

House they [members of the General Assembly] shall not be questioned in any other place." Article 1, § 6 of the Constitution of the United States of America states that "for any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place." Therefore, aside from punctuation and capitalization, the clauses are identical.

Rights of 1689, which stated that "the freedom of speech, and debates or proceedings in parliament, ought not to be impeached or questioned in any court or place out of parliament." [10] James Wilson, a Pennsylvania delegate to the Constitutional Convention in Philadelphia and an esteemed attorney, defended the privilege in 1791:

> In order to enable and encourage a representative of the publick to discharge his publick trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offence. [11]

In fact, according to Professor Akhil Amar in his new book *America's Constitution: A Biography*, Kentucky legislators relied upon their immunity to speak out against federal lawmakers when many others withheld criticism due to fear of prosecution under the infamous 1798 Sedition Act. [12]

This principle of legislative immunity was well-articulated in *Powell v. McCormack*, [13] where the United States Supreme Court stated that the Speech and Debate Clause is intended to preserve legislative fearlessness by insuring "that legislators are not distracted from or hindered in their performance of their legislative tasks by being called into court to defend their actions." [14] In *Powell*, Congressman Adam Clayton Powell, Jr., was denied his seat in the House of Representatives for engaging in deceitful practices in the previous session of Congress. In response, he and a number of voters of his district brought suit against a few members of Congress, including Speaker John W. McCormack in his official capacity as Speaker of the House of Representatives. The Clerk of the House of Representatives, the Sergeant at Arms and the Doorkeeper were named in their personal and official capacities. In holding that Powell was unconstitutionally denied his seat, the U.S. Supreme Court nevertheless dismissed the complaint against the members of Congress and the Speaker of the House, noting that they were protected from being brought into court by the Speech and Debate Clause of the United States Constitution.

■ In Kentucky, the framers of our current constitution—and the previous three—included the same language in our state's organic document. They understood that absolute legislative immunity, even with its negative characteristics, is essential if separation of powers [15] is to be respected and the Commonwealth's legislators are to be encouraged to speak and act candidly on behalf of citizens. This is not materially different from acknowledged judicial and executive immunities, which, stated simply, stand for the proposition that a judge or chief-executive enjoys absolute immunity for actions taken in official capacities while in office. [16] "The rationale for absolute immunity," says Justice

---

10. *See* Akhil Reed Amar, *America's Constitution: A Biography* 101 (Random House 2005).

11. *Id.* at 102.

12. *Id.*

13. 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

14. *Id.* at 505, 89 S.Ct. 1944.

15. Sections 27 and 28 of the Constitution of Kentucky set forth a potent separation of powers in the Commonwealth. *See Fletcher*, 163 S.W.3d at 860–63, for its history and purpose.

16. See *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), for the best recitation of the rule granting judicial immunity and the reasons underlying its desirability. For Kentucky cases recognizing judicial immunity in the Commonwealth see

Cooper in *Yanero v. Davis*,[17] "is not to protect those individuals from liability for their own unjustifiable conduct, but to protect their offices against the deterrent effect of a threat of suit ...."[18] But to further ensure legislative backbone, the U.S. Supreme Court, in the first case in which the clause was presented, liberally interpreted the language of the Speech and Debate Clause to include all "things generally done in a session of [Congress] by one of its members in relation to the business before it."[19] This view of the protections afforded by legislative immunity is intended to fulfill the clause's "full design," thus extending to "giving of a vote, to the making of a written report, and to every other act resulting from the nature, and in the execution, of the office."[20] Kentucky law is in accord.[21] And

such a view is also consistent with the immunity afforded to judges, which immunizes judges from suit for any judicial act, which is defined as any act that is of the nature normally performed by a judge and one in which the parties dealt with the judge in his official capacity. Such judicial immunity applies even if "the action he took was in error, was done maliciously, or was in excess of his authority" so long as the judge did not act in the "clear absence of all jurisdiction."[22]

 Therefore, though the General Assembly and its members would appear to be appropriate parties-defendants as their failure to enact a budget caused the alleged injury, no member may be questioned for actions taken or not taken in the capacity of legislator.[23] However, this

---

*Henry v. Wilson*, 249 Ky. 589, 61 S.W.2d 305 (1933), and *Vaughn v. Webb*, 911 S.W.2d 273 (Ky.App.1995) ("a judge is immune from personal liability for judicial acts if at the time he acted, regardless of whether he acted in error, maliciously, or in excess of his authority, he had jurisdiction over the subject matter before him."). In the area of executive immunity, see *Yanero v. Davis*, 65 S.W.3d 510, 518 (Ky.2001), which favorably cites federal authority, *Nixon v. Fitzgerald*, 457 U.S. 731, 749, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), for the proposition that a chief executive enjoys absolute immunity for official acts taken while in office. *But see Clinton v. Jones*, 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (immunity does not bar suit for unofficial acts). Also, though unsettled, there is a strong argument in favor of barring criminal charges against a sitting chief executive for actions taken while in office because both the federal and state constitutions allow for their impeachment and, upon conviction, state that he "shall nevertheless be liable and subject to Indictment, Trial, Judgment, and Punishment, according to Law." Art. I, § 3, cl. 7.

**17.** 65 S.W.3d 510 (Ky.2001).

**18.** *Id.* at 518.

**19.** *Kilbourn v. Thompson*, 103 U.S. (13 Otto) 168, 204, 26 L.Ed. 377 (1880).

**20.** *Coffin v. Coffin*, 4 Mass. 1 (1808).

**21.** *See Wiggins v. Stuart*, 671 S.W.2d 262, 264 (Ky.App.1984) (citing *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)); *see also Yanero*, 65 S.W.3d 510.

**22.** *See Stump*, 435 U.S. 349 at 362, 98 S.Ct. 1099, 55 L.Ed.2d 331.

**23.** This proposition does not call into question this Court's holding in *Rose v. Council for Better Education*, 790 S.W.2d 186 (Ky.1989) (holding the school system violated Section 183 of the Constitution of Kentucky because it did not "provide for an efficient system of common schools throughout the state"), because "[a] Congressman is not by virtue of the Speech or Debate Clause absolved of the responsibility of filing a motion to dismiss and the trial court must still determine the applicability of the clause to plaintiff's action." *Powell*, 395 U.S. at 506 n. 25, 89 S.Ct. 1944, 1956, 23 L.Ed.2d 491 (citing *Tenney*, 341 U.S. at 367, 71 S.Ct. at 788, (1951)). In *Rose* neither the President of the Senate nor the Speaker of the House moved the Court to dismiss based on legislative immunity. In short, the immunity provided by Section 43 is not self-executing and must be asserted.

does not end the inquiry. Legislative immunity and constitutional judicial review of legislative acts must coexist.[24] A plaintiff aggrieved by unconstitutional legislation must be allowed recourse against a governmental actor as a means of asserting his claim that the enactment is unconstitutional. The U.S. Supreme Court stated in *Powell* that "although an action against a Congressman may be barred by the Speech or Debate Clause, legislative employees who participated in the unconstitutional activity are responsible for their acts."[25] As noted above, the U.S. Supreme Court dismissed the claim against the named members of the House of Representatives, but it allowed the suit as against the Clerk of the House, the Sergeant at Arms, and the Doorkeeper, the ministerial officers charged with implementing the decision to deny Powell his seat. In part, the Court relied on *Stockdale v. Hansard*[26] as follows:

> [I]f the Speaker, by authority of the House, order an illegal Act, though that authority shall exempt him from question, his order shall no more justify the person who executed it than King

Charles's warrant for levying ship-money could justify his revenue officer.[27] In *Eastland v. United States Servicemen's Fund*[28], the U.S. Supreme Court dismissed a complaint against nine senators based on immunity, but indicated that the plaintiff could have brought suit against U.S. Marshalls had they served a subpoena,[29] and in *Kilbourn v. Thompson*[30] the Court dismissed a case against legislators while allowing the claim to proceed against the Sergeant at Arms even though he merely executed the House Resolution in question.[31] Applied to this case, the Appellants could have named the Clerk of each House (for certifying the passage of the budget bill) or any other official actor who took part in the process.[32]

Allowing suit against the Clerk of either House or other ministerial officers while barring the same suit against members may seem to be a charade or a smoke-and-mirrors performance. But that's not true. The fact that immunity from suit for members of the General Assembly for their legislative acts is constitutionally required by text and history is reason enough to

24. *Powell,* 395 U.S. at 506, 89 S.Ct. 1944 ("The purpose of the protection afforded legislators is not to forestall judicial review of legislative action."). The Federalist No. 78, at 404 (Alexander Hamilton) (Gideon Ed., George W. Carey and James McClellan, 2001) ("The interpretation of the laws is the proper and peculiar province of the courts. A constitution is, in fact, and must be regarded by the judges, as a fundamental law. It therefore belongs to them to ascertain its meaning, as well as the meaning of any particular act proceeding from the legislative body.").

25. *Id.* at 504, 89 S.Ct. 1944.

26. (1839) 112 Eng Rep. 1112, 1156 (Q.B.).

27. *Id.* at 114.

28. 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975).

29. *Id.* at 494–95 n. 4, 95 S.Ct. 1813.

30. 103 U.S. (13 Otto) 168, 26 L.Ed. 377 (1880).

31. *Id.*

32. It is not inconceivable that a circumstance could arise in which a party wishing to obtain judicial review of some aspect of legislative conduct would be unable to identify a. proper non-legislator defendant. The Supreme Court of the United States has recognized this dilemma but has not yet found it necessary to resolve this conflict between judicial review and legislative immunity. "[W]e need not decide whether under the Speech or Debate clause petitioners would be entitled to maintain this action solely against members of Congress where no agents participated in the challenged action and no other remedy was available." *Powell,* 395 U.S. at 506 n. 26, 89 S.Ct. 1944.

observe the principle. But in addition, the republican spirit of the constitution is championed by granting legislators protection from having to defend themselves for actions taken as representatives of their constituents. Such protection is not so jeopardized, or courageous action chilled, by a suit filed against other state actors even though legislators may have a moral or ethical duty to them. In fact, such ministerial employees are essential to the legislative process, and if they act contrary to their constitutional oath, they may be held accountable.

■■■■ We now turn to whether Appellants would have been entitled to the five percent pay increase even if a proper defendant had been named. First, there is no doubt that the General Assembly intended to retroactively suspend KRS 18A.355 when it enacted the fiscal year 2002–2004 biennial budget on March 25, 2003. KRS 446.080(3) states that "[n]o statute shall be construed to be retroactive, unless expressly so declared." Though it is clear that the General Assembly must expressly manifest its desire that a statute apply retroactively, magic words are not required. What is required is that the enactment make it apparent that retroactivity was the intended result.[33] There is abundant evidence that such a result was intended here.

House Bill 269 stated that "[n]otwithstanding KRS 18A.355(1), a cost-of-living adjustment of two and seven-tenths percent is provided in fiscal year 2002–2003 on the base salary or wages of each eligible state employee on their anniversary date." And the language in Senate Bill 48 was substantially similar: "The General Assembly hereby appropriates for the fiscal year 2002–2003 funds required for those expenditures that have been approved by the Secretary of Finance.... The provisions of ... this Act shall apply to periods preceding the effective date of House Bill 269 and House Bill 294 of the 2003 Regular Session." Furthermore, Part IV of HB 269 explicitly refers to the "2002–2004 biennium", further evincing the General Assembly's intent that the budget apply retroactively. And, though this language would be dispositive of the question, it is confirmed by the actual amount of money appropriated. The General Assembly appropriated just enough to pay a two and seven-tenths percent raise for all employees. There was no money for a five percent increment, including employees who had an annual-increment anniversary date prior to the budget enactment. When a sum certain is appropriated there can be no legitimate contention that more spending was intended. In *Hager v. Shuck*[34] this Court stated that salaries of the auditor's clerks must not exceed the amount legislatively appropriated.[35] Thus, we conclude that legislative intent was to suspend KRS 18A.355 and make it retroactive to the beginning of the biennium.

■■■■ However, we must address a final point. The Appellants argue that the General Assembly was without power to suspend the statute because the employees had a right to the statutory five percent raise and a determination otherwise would violate due process of law. Initially, we note that the long-standing practice of this Court is to refrain from reaching constitutional issues when other, non-constitutional

**33.** *See Commonwealth of Kentucky, Department of Agriculture v. Vinson,* 30 S.W.3d 162 (Ky.2000); *see also Taylor v. Asher,* 317 S.W.2d 895, 897 (Ky.1958) (recognizing the "principle of statutory construction that retroactive effect or retroactive application of an act will not be given or made unless the intent that it should be is clearly expressed or necessarily implied").

**34.** 120 Ky. 574, 87 S.W. 300 (1905).

**35.** *Id.* at 302.

grounds can be relied upon.[36] Furthermore, we appreciate that a proper respect for the legislative branch obliges us to assume the constitutionality of legislative enactment. Therefore, we must not reach a constitutional issue if other grounds are sufficient to decide the case.

■■■■ The parties concede that the General Assembly has the authority to adjust the salaries of its employees at any time. Included within that authority is the power to adjust annual increments. Therefore, even if the Appellants are correct that they had a right to the statutory five percent increment, the General Assembly had authority to adjust their pay to meet its fiscal objectives. The intent of the General Assembly was to appropriate money to fund an identical increment for all employees. To interpret the budget bill otherwise would be to ignore the plain meaning of the budget bill, the clear intent of the General Assembly, and our precedents. Furthermore, such an interpretation would reach the absurd result of distinguishing between employees based on nothing more than their hire date.

## CONCLUSION

Upon our consideration of the whole case and as discussed herein, we are persuaded that the Appellants were lawfully compensated. As such, the final order of the Franklin Circuit Court is affirmed.

GRAVES, JOHNSTONE, and SCOTT, JJ., concur.

COOPER, J., dissents by separate opinion in which WINTERSHEIMER, J., joins.

ROACH, J., not sitting.

**36.** *See, e.g., Dawson v. Birenbaum,* 968 S.W.2d 663 (Ky.1998).

**1.** The statute was repealed, effective March 16, 2005.

COOPER, Justice, dissenting.

At the 2002 regular session of the General Assembly, the Republican-controlled Kentucky Senate and the Democrat-controlled Kentucky House of Representatives deadlocked on whether to appropriate funds for the election campaign fund created by the Public Financing Campaign Act, former KRS 121A.020,[1] and adjourned *sine die* on April 15, 2002, without enacting a budget bill for the 2002–04 biennium for either the executive or judicial departments. Nor did the General Assembly suspend any statutory mandates; specifically, it did not suspend KRS 18A.335(1), which provides:

(1) An annual increment of not less than five percent (5%) of the base salary or wages of each state employee shall be granted to each employee on his anniversary date. The employee's base salary or wages shall be increased by the amount of the annual increment. When any increment due to a promotion, reallocation, reclassification or salary adjustment is granted an employee, the employee's base salary or wages shall be increased by the amount of such increment. An employee's base salary or wages shall not be increased by the amount of lump-sum payment awarded under KRS 18A.110(7)(j).

On June 26, 2002, Governor Patton promulgated an "Executive Spending Plan" and authorized the Secretary of the Finance and Administration Cabinet to issue warrants against the treasury to implement that plan "and to assist the Court of Justice as may be necessary to implement lawful expenditures for its operation."[2]

**2.** On June 27, 2002, the Chief Justice promulgated an order implementing a spending plan to cover the expenses of the judicial department from and after July 1, 2002, and issued warrants against the treasury to fund that plan. Ky. Const. § 120. Thus, nothing de-

Exec. Order No.2002–727, para. 6, at 4. In essence, the Governor adopted his own executive department budget and ordered appropriations from the state treasury to fund it. The Executive Spending Plan also purported to suspend a number of state statutes, including KRS 18A.335(1), and substituted therefor an increase in salary and wages of state employees of only 2.7%. The legislative deadlock ultimately resolved itself when all potential gubernatorial candidates announced their intentions to reject public financing of the 2003 election. During its 2003 regular thirty-day session, the General Assembly enacted a budget bill for the 2002–04 biennium that did not fund the election campaign fund but purported to ratify the Governor's expenditures under the Executive Spending Plan, *nunc pro tunc,* suspending KRS 18A.355(1) and granting state employees a 2.7% cost-of-living increase *"in* fiscal year 2002–2003." 2003 Ky. Acts, ch. 156, Part IV–3. (eff. March 31, 2003, 2003 Ky. Acts, ch. 182) (emphasis added). *See generally Fletcher v. Commonwealth,* 163 S.W.3d 852, 857 (Ky.2005); Paul E. Salamanca, *The Constitutionality of an Executive Spending Plan,* 92 Ky. L.J. 149, 152–58 (2003–04).[3]

Section 15 of our Constitution provides: "No power to suspend laws shall be exercised unless by the General Assembly or its authority." Since this provision is a part of the Bill of Rights, the Governor could not suspend statutes even if he possessed "emergency" or "inherent" powers under Sections 69 and 81. Ky. Const. § 26 ("To guard against transgression of the high powers which we have delegated, We Declare that every thing in this Bill of Rights is excepted out of the general pow-

ers of government . . . ."). Thus, Governor Patton's attempted suspension of KRS 18A.335(1) was unconstitutional and invalid *ab initio. Fletcher,* 163 S.W.3d at 872.

Where the General Assembly has mandated that specific expenditures be made on a continuing basis, such is, in fact, an appropriation. *Id.* at 865. Since the General Assembly did not suspend KRS 18A.355(1) prior to the beginning of the fiscal year, and since Governor Patton's attempt to do so was invalid *ab initio,* KRS 18A.355(1) went into effect on that date and every state employee obtained a vested right to a 5% cost-of-living increase on that date or upon reaching that employee's anniversary date, whichever date was applicable to that employee.

There is no need to jump through hoops to determine whether the language of the 2003 budget bill complied with the requirement of KRS 446.080(3) that "[n]o statute shall be construed to be retroactive, unless expressly so declared." (I do not find the word "retroactive" anywhere in Part IV–3 of the budget bill. 2003 Ky. Acts, ch. 156, Part IV–3. If not, how could such be "expressly so declared"?) For even if the General Assembly had complied with KRS 446.080(3), it could not retrospectively divest those state employees of money in which they had obtained a vested right and which was owed to them after July 1, 2002, and prior to March 31, 2003.

The moment he died her rights under his will attached. Her title was then vested, and no change in the law thereafter made could disturb such vested rights. The title to all his property was vested in her, subject to his debts. . . . It

cided in this case will affect the pay of any judicial branch employee.

**3.** While the resolution of this dispute precluded the Court of Justice from ruling on the constitutionality of Governor Patton's Execu-

tive Spending Plan, we later held in *Fletcher,* 163 S.W.3d at 860–65, that an attempt by the Governor to unilaterally adopt a budget for the executive department was unconstitutional. Ky. Const. §§ 27, 28, 230.

was not within the power of the state thereafter, by mere legislation, to impose upon her any additional obligation or to create any charge against her property. To do so would be a taking of her property without due process of law. The Legislature has the undoubted right to repeal all legislative acts which are not in the nature of contracts or private grants, but the repeal of a law cannot affect or impair rights which have been acquired under it. So of the adoption of a new law. It can have no retrospective operation so far as vested rights are concerned. Statutes are not to be given a retrospective operation except where it is manifest the Legislature intended they should have such operation, *and it is not competent even for the Legislature to give such operation to an act where it will affect existing vested rights.*

*People v. Sears,* 344 Ill. 189, 176 N.E. 273, 277 (1931) (emphasis added) (citations omitted). *See also Landgraf v. USI Film Prods.,* 511 U.S. 244, 266, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994) ("The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just compensation.' "); *Whitaker Coal Co. v. Melton,* 18 S.W.3d 361, 364 (Ky.App.2000) (1996 General Assembly could not divest worker of vested right to RIB award, entitlement to which vested prior to 1996 enactment); *Coco v. Miller,* 193 Ark. 999, 104 S.W.2d 209, 211 (1937) ("[I]f section 2 is construed as giving to the act a retroactive effect that section must fall because rights conferred by statute are determined according to statutes which were in force when the rights accrued and are not affected by subsequent legislation. The Legislature has no power to divest legal or equitable rights previously vested.").

Nor is there any need to delve into the immunity of legislators under the assumption that Appellants should have filed suit against the members of the General Assembly who allegedly voted to retrospectively divest them of their vested rights. The General Assembly appropriated the funds for the 5% cost-of-living increase when it failed to suspend KRS 18A.355(1). *Fletcher,* 163 S.W.3d at 865. Appellants needed only to demand payment from the State Treasurer of the appropriated amounts and, if denied, to bring an action for a writ of mandamus.

It is unknown why Appellants chose to sue the Governor instead of the Treasurer and/or the Secretary of the Finance and Administration Cabinet. Perhaps they did so because the Secretary of the Finance and Administration Cabinet works for the Governor. However, if the Governor thought he was an improper party to the action, he could have filed a motion to dismiss under CR 12.02(g). Failure to join a proper party is not jurisdictional, thus does not warrant a *sua sponte* dismissal. The same holds true for allegedly suing an improper party. CR 9.01; *cf. Lawrence v. Marks,* 355 S.W.2d 162, 163 (Ky.1961) ("improper party plaintiff" is not grounds for dismissal of an action). If a motion to dismiss is made under CR 12.02(g), the court can order that the proper party be joined unless that party is not subject to service of process. CR 19.01; CR 19.02; *Cabinet for Human Res. v. Ky. State Pers. Bd.,* 846 S.W.2d 711, 714 (Ky.App.1992) ("When one litigant believes there to be an indispensable party it should request the court to order joinder by the simple expedient of filing a motion. If the court concurs then service of process shall issue, but in any event, it should be accomplished by a pleading or motion and a brief is neither."). To date, no one has filed such a motion or raised the issue by pleading or even brief. Thus, the "improper party"

allegation, like the immunity of members of the General Assembly, is a non-issue in this case.

Accordingly, I dissent.

WINTERSHEIMER, J., joins.