OPINION OF THE COURT BY CHIEF JUSTICE MINTON
When it enacted Kentucky Revised Statute ("KRS") 12.028, the General Assembly empowered the Governor "between sessions of the General Assembly, temporarily [to] effect a change in the state government organizational structure" of "any organizational unit or administrative body" in the Commonwealth.[1] And the Governor exercised that authority when he issued Executive Order ("EO") 2017-364, which made several changes to various state education boards. The Attorney General sued in circuit court to challenge the validity of the executive order, and that court upheld it. On discretionary review, we find no statutory or constitutional infirmity with the Governor's use of the executive order to affect a temporary government reorganization on the facts before us, so we affirm the circuit court's judgment.
I. BACKGROUND.
Central to this dispute is KRS 12.028, Subsection 1 of which gives the Governor the ability to "propose to the General Assembly, for [the General Assembly's] approval, changes in the state government organizational structure which may include *676 the creation, alteration or abolition of any organizational unit[2] or administrative body[3] and the transfer of functions, personnel, funds, equipment, facilities, and records from one (1) organizational unit or administrative body to another." And Subsection 2 states in relevant part: "Recognizing that changes in the state government organizational structure may need to be made as rapidly as possible to achieve greater economy, efficiency, and improved administration as the needs of government dictate, the Governor ... may, between sessions of the General Assembly, temporarily effect a change in the state government organizational structure as described in subsection (1)[.]" Subsection (5) emphasizes the temporary nature of such a reorganization: "A temporary reorganization effected under subsection[ ] (2) ... shall be terminated ninety (90) days after sine die adjournment of the next regular session of the General Assembly unless otherwise specified by the General Assembly."
Exercising this legislatively-recognized power under KRS 12.028, the Governor issued EO 2017-364, the effect of which the circuit court aptly summarized:
The Order creates the Charter Schools Advisory Council, to advise the Kentucky Department of Education on charter schools, and allow[ ] overlapping membership with other education boards; altered the Standards and Assessments Process Review Committee's membership to allow membership overlap with other boards; modified the Council on Postsecondary Education to guarantee that a citizen member is a non-voting, non-member advisor to the Kentucky Board of Education; and changed the Kentucky Board of Education to include four non-voting, non-member advisors who are on the Council on Postsecondary Education, the Education Professional Standards Board, the School Curriculum Assessment and Accountability Council, and the Charter Schools Advisory Council, or an individual with experience in education. The Order restructured the School Curriculum[ ] Assessment and Accountability Council with 15 members, rather than the previous 17 members, and altered membership requirements; reorganized the Reading, Diagnostic, and Intervention Grant Steering Committee with one less member at 15, and modified the membership requirements; reorganized the State Advisory Council for Gifted and Talented Education, reducing membership numbers from 19 to 11, and altering membership criteria; and abolished and re-created the State Advisory Panel for Exceptional Children as the State Advisory Council for Exceptional Children with 21 members, rather than 20 previous members, and additional[ly] represents individuals with disabilities. The Order finally abolished and re-created the Education Professional Standards Board with 13 members instead of the previous 15 members, and provided new membership criteria, and altered the appeal process for decisions - appeals now go to the Kentucky Board of Education for review before appeal to the Circuit Court rather than automatically going to the Circuit Court for review of the Board's final decision[.]
*677 The circuit court upheld the validity of EO 2017-364 except for the portion restructuring the appeal process within the Education Professional Standards Board, which the circuit court ruled unconstitutional. And the Governor has not appealed that ruling. The Attorney General appealed the remainder of the trial court's ruling and sought immediate transfer of the case directly to this Court, which we granted.
II. ANALYSIS.
KRS 12.028 authorizes the Governor to effectuate for the interim between legislative sessions a temporary reorganization of the state's "organizational units and administrative bodies." The Governor executed this authorization by promulgating EO 2017-364, temporarily reorganizing various state education boards. The Attorney General makes several constitutional and statutory arguments challenging the validity of the temporary reorganization mechanism itself and some of its inner workings. We address those challenges below.
A. Statutory Arguments
Because this Court respects the principle that "constitutional issues should be avoided if possible[,]"[4] we address the Attorney General's statutory arguments first.
The Attorney General argues that the General Assembly exempted the state's education boards from the ambit of KRS 12.028. According to the Attorney General, KRS 12.295 specifically outlines the chapters in the Kentucky Revised Statutes that govern the various state education boards to which the Governor made changes and that no other statute not referred to in KRS 12.295 applies to the governance of the boards. This specific outlining, the Attorney General argues, further indicates the General Assembly's intent to exempt them from the domain of KRS 12.028.
KRS 12.028 plainly applies to "organizational units and administrative bodies[.]" KRS 12.295 states, "The following organizational units and administrative bodies shall be governed by their respective substantive chapters as set out below[,]" followed by a list of the education boards at issue and their respective governing statutes. KRS 12.295 terms the education boards as "organizational units and administrative bodies[,]" the exact entities that KRS 12.028 encompasses as being within the ambit of the Governor's reorganization power.
Contrary to the Attorney General's interpretation of KRS 12.295, we find no indication from that statute that the chapters listed in conjunction with the specific board they govern represents an exhaustive list of governing statutes excluding application of every other statute not listed. KRS 12.295 reads more as a table of contents or index, giving directions to the reader on where to find the main governing provisions of certain boards rather than instruction from the General Assembly that no statute outside of the ones listed in KRS 12.295 has any application to the listed boards.
Not only does the plain text support the Governor's position: If the General Assembly truly intended for the organizational units and administrative bodies listed in KRS 12.295 to be exempt from reorganization under KRS 12.028, it would have explicitly said so- KRS 12.028 like other statutes, explicitly exempts certain organizational units and administrative bodies from reorganization.[5]
*678 The Attorney General also argues that the governing Chapters themselves signal the intent of the General Assembly to remove the boards that the Governor reorganized from the Governor's reorganization power under KRS 12.028. Although the Attorney General makes various statutory-construction arguments to persuade us of the General Assembly's intent to exclude the Kentucky Education Boards from the ambit of KRS 12.028, these arguments contradict the plain and explicit text of that statute. We need not look beyond the plain and unambiguous text of the General Assembly in our statutory interpretation.[6] And the plain text of KRS 12.028, explicitly stating that the reorganization power applies to "organizational units and administrative bodies," coupled with the plain text of KRS 12.295, which specifically terms all the education boards at issue today as "organizational units and administrative bodies," confirms that all of the education boards come within the broad sweep of KRS 12.028.
In sum, we find the various education boards at issue fall within the ambit of the Governor's temporary-reorganization-outside-of-session power stemming from KRS 12.028. We cannot accept the Attorney General's suggested statutory interpretation in the face of such clear text.
The Attorney General further argues that the General Assembly has limited the Governor's authority with respect to the boards to one of appointment-not removal-authority. The Attorney General cites the various statutes governing the various boards at issue providing for mandatory terms for its sitting members. The Attorney General also cites to KRS 63.080, which says that individual members on some of the boards at issue cannot be removed from their positions by the Governor without cause. If the Governor can reorganize these boards at the Governor's whim, these statutes providing for mandatory terms are meaningless, the Attorney General argues.
As we previously stated, this Court cannot ignore the plain text of KRS 12.028 in favor of the Attorney General's statutory interpretation. KRS 12.028(2) explicitly allows the Governor to "temporarily effect a change in the state government organizational structure as described in subsection (1) of this section[.]" The change described in KRS 12.028(1) "include[s] the creation, alteration or abolition of any organizational unit or administrative body and the transfer of functions, personnel, funds, equipment, facilities, and records from one (1) organizational unit or administrative body to another." If the Governor's power includes the "alteration or abolition of any organizational unit or administrative body," that necessarily means that members of the specific board that the Governor has abolished may be removed from their positions.
*679 Moreover, simply because statutes exist to define a set term of years for an individual to serve as a member of a board does not mean that the appointed member may not be removed from service. The set term of years is the ceiling, not the floor. Indeed, KRS 63.080 itself allows the Governor removal power. Although that statute limits that removal power in some instances "for cause," the Governor is still able to remove members of the boards at issue here. And the Attorney General has not argued that the Governor's removal of some of the boards' members was without cause; rather, the Attorney General argues that the statutes establishing service for a set term by various members of the various boards at issue evidences an intention by the General Assembly to disconnect these boards from the ambit of KRS 12.028. But, as stated earlier, that argument disregards the plain text of KRS 12.028.
To conclude, the plain text of KRS 12.028 gives the Governor the statutory power to do what he did. Although the Attorney General offers several statutory-construction arguments to support his assertion that the General Assembly meant to exclude the state education boards from the Governor's reorganization power under KRS 12.028, the plain text of KRS 12.028 says otherwise.
B. Constitutional Arguments
The Attorney General makes three constitutional arguments. He asserts that the Governor's power to affect a temporary reorganization outside of legislative session to be a violation of: 1) the suspension provision of Section 15 of the Kentucky Constitution ; 2) the education provision of Section 183 of the Kentucky Constitution ; and 3) the separation of powers doctrine generally and the nondelegation doctrine specifically.
1. The temporary reorganization mechanism does not violate Section 15 of the Kentucky Constitution.
The Attorney General first argues that the temporary reorganization mechanism of KRS 12.028, as used in EO 2017-364, violates Section 15 of the Kentucky Constitution. Section 15 states, "No power to suspend laws shall be exercised unless by the General Assembly or its authority." The Attorney General posits that EO 2017-364 "suspend[ed] laws" by effecting changes to the various Kentucky education boards in conflict with the boards' governing statutes. For example, KRS 161.028(2)(a) provides that the Education Professional Standards Board "shall be composed of seventeen (17) members," yet EO 2017-364 reduces the number of members to fifteen. This, the Attorney General argues, is an unconstitutional suspension and rewriting by the Governor of duly enacted law.
But the Attorney General's argument fails to persuade us because even if we were to agree that the changes made by EO 2017-364 constitute a suspension of law, the Attorney General ignores the latter half of Section 15 : "No power to suspend laws shall be exercised unless by the General Assembly or its authority. "[7] In Lovelace v. Commonwealth, this Court recognized that when the General Assembly expressly grants to another branch the power to suspend a law, that branch constitutes the General Assembly's authority for purposes of Section 15 and that branch's execution of a suspension of the laws does not violate Section 15.[8]
*680 At issue in Lovelace was the constitutionality of a statute allowing the judiciary to probate the sentence of a convicted criminal in certain situations.[9] In upholding the constitutionality of that statute, the Court said this:
We need not here inquire into the extent to which the power to suspend the rendition and entry of a judgment inheres in the court as a judicial function or how far other statutes should be construed as requiring the rendition of judgment in a reasonable time after the verdict. Whatever the extent of those directions and limitations may be, the power in the legislature to authorize the courts to suspend those laws is in the logically implied affirmation contained in Section 15 of the Constitution of Kentucky, declaring "No power to suspend laws shall be exercised, unless by the general assembly or its authority." By this act of 1936, the General Assembly has exercised that constitutional power and has authorized the courts to suspend the implications of the law which require entry and pronouncement of judgment without unreasonable delay.[10]
By enacting KRS 12.028, the General Assembly granted the Governor the authority in the interim between legislative session to reorganize temporarily state organizational units and administrative agencies. KRS 12.028 is the General Assembly's authority for purposes of Section 15. This is the difference between the present case and the cases the Attorney General relies on to support his position. In Baker v. Fletcher,[11] Fletcher v. Commonwealth,[12] and Beshear v. Haydon Bridge,[13] the General Assembly had not granted the Governor the authority to suspend the law. Here, the temporary reorganization mechanism established by KRS 12.028, in conjunction with the Governor's exercise of that temporary reorganization mechanism by his issuance of EO 2017-364, not only does not violate Section 15 but directly conforms to it because the General Assembly has explicitly designated the Governor under its authority to suspend the law.
Simply put, the temporary reorganization mechanism laid out by KRS 12.028 and executed by EO 2017-364 does not violate Section 15 of the Kentucky Constitution because the Governor possesses the General Assembly's authority to do so under that constitutional provision by virtue of the General Assembly having so stated.
2. The temporary reorganization mechanism does not violate Section 183 of the Kentucky Constitution.
Next, the Attorney General asserts that the temporary reorganization mechanism violates Section 183 of the Kentucky Constitution. Section 183 states: "The General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State." We fail to see how KRS 12.028 is anything but a statute fully within the scope of Section 183.
KRS 12.028 is a statute that "provides for an efficient system of common schools throughout the State" by allowing the Governor temporarily to reorganize the state's education boards "to achieve greater economy, efficiency, and improved administration" of the education system.[14] This power stems from the recognition that "changes in the state government organizational structure may need to be made as rapidly as possible,"[15] i.e., cannot delay until the *681 legislature convenes. As with the relationship of KRS 12.028 to Section 15, KRS 12.028 not only does not violate Section 183, it conforms to it.
In sum, KRS 12.028 allows the Governor to address what the Governor perceives to be problems with the Commonwealth's "system of common schools[,]" specifically, problems with organization of its education boards, by effectuating changes to those boards. Contrary to the Attorney General's argument on this point, our decision in Rose v. Council for Better Educ., Inc.[16] does not stand for a categorical rule banning all action taken by the executive department affecting the state's system of common schools, especially when the legislative department itself requests assistance from the executive-the only department of state government that can carry out the General Assembly's will. Nor do Sections 185 and 186 of the Kentucky Constitution evidence such a categorical rule.
The General Assembly enacted KRS 12.028, a law that the legislative body apparently believes promotes Kentucky's system of common schools by granting interim power to the Governor to effectuate temporary reorganizations. If KRS 12.028 and EO 2017-364 pass constitutional scrutiny, which they do, then the judiciary cannot gainsay that policy decision.
3. The temporary reorganization mechanism does not violate the separation of powers or nondelegation doctrines.
Finally, the Attorney General argues that the temporary reorganization mechanism violates the separation of powers doctrine. "It is well settled law in the state of Kentucky that one branch of Kentucky's tripartite government may not encroach upon the inherent powers granted to any other branch."[17] The Attorney General adds that the temporary reorganization mechanism violates the nondelegation doctrine, a principle deriving from the separation of powers doctrine. "The nondelegation doctrine recognizes that the Constitution vests the powers of government in three separate branches and, under the doctrine of separation of powers, each branch must exercise its own power rather than delegating it to another branch."[18] The Attorney General argues that only the General Assembly-the legislative department-has the power to reorganize the Commonwealth's education boards and that the delegation of this power to the Governor-the executive department-violates the principle of the separation of powers.
Our precedent ostensibly disposes of this issue. As we stated in Brown v. Barkley: "[W]e are satisfied that the transfer of an existing, legislatively-created function from one executive agency or department to another is essentially an executive action ... and is not an exercise of legislative power by the chief executive [.]"[19] And we reaffirmed this principle in Legislative Research Comm'n ex rel. Prather v. Brown: "[O]nce the General Assembly has made a determination that the power to reorganize state government in the interim between legislative sessions does exist, and determines that that power is in the hands of the Governor, such interim action is purely an executive function."[20] So Legislative Research Comm'n and *682 Barkley stand for the rule that the power temporarily to reorganize organizational units and administrative agencies of state government during the interim between sessions is a legislatively recognized and sanctioned executive power that does not encroach on the legislative power of the General Assembly.
Leaving aside the unassailability of that rule as it applied to the facts in both of those cases, it simply does not apply to the facts in the present case. "It would be difficult, perhaps impossible, to define the extent of the legislative power of the state, unless by saying that so far as it is not restricted by the higher law of the state and federal constitutions, it may do everything which can be effected by means of a law."[21] "The legislative power we understand to be the authority under the constitution to make the laws, and to alter and repeal them[.] The difference between the departments undoubtedly is that the legislat[ure] makes, the executive executes, and the judiciary construes, the law."[22]
In the present case, the General Assembly created, by statute, the various education boards at issue. The General Assembly, by statute, outlined various aspects of those boards, ranging from the number of members populating them to the duties and responsibilities of those boards. Simply put, KRS 12.028, which allows the Governor to change the makeup and functions of those boards-even going so far as abolishing existing boards and creating new ones-is a grant of legislative authority to the executive department. KRS 12.028 allows the executive department to engage in lawmaking by allowing the Governor to alter the General Assembly's duly enacted statutes outlining the various aspects of the state's education boards.
Simply because this lawmaking occurs in the interim-the period when the legislature is not in session-does not alter the fact that the power being exercised by the Governor is lawmaking. The making and changing of laws is the hallmark of the legislative power no matter if it occurs during the legislative session or in the interim. And lawmaking in the interim is still lawmaking. KRS 12.028 allows the Governor to "between sessions of the General Assembly, temporarily effect a change in the state government organization structure" that "include[s] the creation, alteration or abolition of any organizational unit or administrative body and the transfer of functions, personnel, funds, equipment, facilities, and records from one (1) organizational unit or administrative body to another." Simply put, KRS 12.028 allows the Governor to change the law. That is an exercise of legislative power. The time within which an action occurs does not change the nature of the action-simply because the changing of statutes occurs outside of session does not change the fact that statutes are being changed-lawmaking is occurring.
Moreover, we cannot say as our precedent may suggest that because the General Assembly has prescribed a statute that allows the Governor to change statutes, the Governor is simply executing the laws by acting under a grant of legislative authority. Taking this notion to its logical conclusion, the General Assembly could pass a law stating, "The Governor shall have the power to change all laws of this Commonwealth between sessions of the General Assembly," and, under the "executing the laws" rule, there would be no separation of powers violation because the Governor, if he or she changes all laws in the Commonwealth, would simply be executing *683 the statute. But at its core, the execution of the statute at issue in the present case allows the Governor to engage in lawmaking-exercise legislative authority.
All this being true, the delegation of legislative power by the General Assembly to the executive department is not totally prohibited: "[T]he nondelegation doctrine recognizes that ... given the realities of modern rule-making, [the legislature] neither has the time nor the expertise to do it all; it must have help."[23] "As a result of this reality, we have acknowledged that [other branches] may exercise legislative ... authority if certain protections are in place."[24] "The General Assembly may validly vest legislative ... authority in [another branch] if the law delegating that authority provides 'safeguards, procedural and otherwise, which prevent an abuse of discretion by the agency.' "[25] "The doctrine of the separation of powers was adopted ... to preclude the exercise of arbitrary power. The purpose was ... to save the people from autocracy."[26] "The purpose of the nondelegation doctrine should no[ ] longer be either to prevent delegation or to require statutory standards; the purpose should be the much deeper one of protecting against unnecessary and uncontrolled discretionary power."[27]
Every reorganization plan the Governor effectuates between sessions is reviewed by members of the General Assembly both at the front and back ends.[28] Even though the Governor can implement the temporary plan in the interim, changes made by the temporary reorganization only survive until the General Assembly's next regular session.[29] Not only can the General Assembly *684 affirmatively reject the Governor's reorganization plan and restore the status quo ante-the Governor's temporary reorganization automatically reverts to the status existing before the Governor instituted it, even by the General Assembly's inaction. The fate of the entire temporary executive reorganization-outside-of-session mechanism rests wholly in the hands of the General Assembly. The General Assembly is instrumentally involved in the temporary reorganization process and has erected its own checks against the executive's permanent use of executive power to organize state government.
The Attorney General aptly observes that broad reorganization authority that the Governor can effectuate temporarily can, and often does, transmute into a de facto permanent reorganization of state government by executive order. This is so, the Attorney General argues, because the temporary reorganization mechanism of KRS 12.028 does not prohibit the Governor from effectuating temporary reorganization plans in a continuous loop, uninterrupted by affirmative action of the General Assembly. There may be a point at which this continuous reorganization loop by executive order unconstitutionally encroaches upon the legislative power of our General Assembly as the Governor effectuates what amounts to a permanent change in the laws that govern organizational units and administrative bodies. But such is not the case before us today. And even if it were, some may view as legislative approval the General Assembly's repeated acquiescence in the continuous loop of executive orders that effectively institute the same reorganizational changes year after year. In any event, the Attorney General has only placed one executive order in issue before us in this case, framing this case as a challenge to the constitutionality of EO 2017-364 and this application of KRS 12.028 under the facts presented here, not as a facial challenge to that statute.
Ultimately, the General Assembly continues to maintain control of the temporary-reorganization-outside-of-legislative-session mechanism. The General Assembly can put an end to the mechanism. Not only that, but the General Assembly could choose explicitly to exempt certain boards from the executive's reorganization power or limit the executive's reorganization power in any way it chooses. And the fact that the executive's interim change only lasts for a period of time between regular sessions and that it can only be effectuated again by another executive order further evidences the temporary nature of the executive's change. The General Assembly's continued extensive control over this temporary mechanism precludes this Court at this time from determining that the General Assembly has abdicated the lawmaking power of the legislative department and delivered it into the hands of the executive department.
In sum, on the facts before us, neither KRS 12.028 nor EO 2017-364 constitutes an unconstitutional delegation of legislative power. Nor did the Governor's reorganization of the Education Professional Standards Board, besides the Governor's restructuring of its appeal process, constitute an unconstitutional infringement on the judiciary's power because the temporary reorganization of this board does not impute the judicial power in any way.[30]
*685 III. CONCLUSION.
We affirm the judgment of the Franklin Circuit Court.
All sitting. Minton, C.J.; Hughes, Keller, Lambert, and Wright JJ., concur. VanMeter, J. concurs in result only by separate opinion, which Buckingham, J., joins.
VANMETER, J., CONCURRING IN RESULT ONLY:
While I agree with the result of the majority opinion, I disagree with that portion that states that the Governor is exercising "legislative power." In my view he is exercising his "executive power" as authorized by the legislature and the Kentucky Constitution.
Buckingham, J., joins.

KRS 12.028(1) and (2).

KRS 12.010(1) defines "organizational unit" to mean "any unit of organization in the executive branch of the state government that is not an administrative body, including but not limited to any agency, program cabinet, department, bureau, division, section or office[.]"

KRS 12.010(8) defines "administrative body" to mean "any multi-member body in the executive branch of the state government, including but not limited to any board, council, commission, committee, authority or corporation, but does not include 'branch,' 'section,' 'unit' or 'office[.]' "

W.B. v. Commonwealth., Cabinet for Health & Fam. Srvcs., 388 S.W.3d 108, 117 (Ky. 2012).

See 12.028(2) ("The Governor may not effect a temporary reorganization plan under this subsection that would change the organizational structure of an organizational unit or administrative body headed by the Kentucky Economic Development Partnership as created in KRS 154.10-010, or another elected state executive officer unless requested in writing by that officer."); KRS 342.1228 ("The Kentucky Workers' Compensation Funding Commission shall not be subject to the Governor's power of reorganization under KRS Chapter 12, including attachment or transfer to another organizational unit or administrative body other than the Labor Cabinet."); KRS 7.090(1) ("There is created a Legislative Research Commission as an independent agency in the legislative branch of state government, which is exempt from control by the executive branch and from reorganization by the Governor.").

Pearce v. Univ. of Louisville, 448 S.W.3d 746, 749 (Ky. 2014) ("[W]e construe a 'statute only as written, and the intent of the Legislature must be deduced from the language it used, when it is plain and unambiguous[.]' ") (quoting W. Ky. Coal Co. v. Nall & Bailey, 228 Ky. 76, 14 S.W.2d 400, 401-02 (1929) ).

(emphasis added).

285 Ky. 326, 147 S.W.2d 1029, 1034-35 (1941) ; see also Commonwealth, ex rel. Armstrong v. Collins, 709 S.W.2d 437, 442-43 (Ky. 1986) (favorably discussing Lovelace ).

147 S.W.2d at 1034-35.

Id. (internal citations omitted).

204 S.W.3d 589 (Ky. 2006).

163 S.W.3d 852 (Ky. 2005).

304 S.W.3d 682 (Ky. 2010).

KRS 12.028(2).

Id.

790 S.W.2d 186 (Ky. 1989).

Elk Horn Coal Corp. v. Cheyenne Res., Inc., 163 S.W.3d 408, 422 (Ky. 2005) (quoting Smothers v. Lewis, 672 S.W.2d 62, 64 (Ky. 1984) ).

TECO Mech. Contractor, Inc. v. Commonwealth, 366 S.W.3d 386, 397 (Ky. 2012) (citing Bd. of Trs. of Jud. Form Ret. Sys. v. Atty. Gen., 132 S.W.3d 770, 781 (Ky. 2003) ).

628 S.W.2d 616, 622 (Ky. 1982) (emphasis added).

664 S.W.2d 907 (Ky. 1984).

Slack v. Maysville & Lexington R.R., 52 Ky. 1, 12 (Ky. 1852).

Purnell v. Mann, 105 Ky. 87, 50 S.W. 264, 266 (1899) (citations omitted).

Bd. of Trs. of Jud. Form Ret. Sys., 132 S.W.3d at 781 (citing Mistretta v. U.S., 488 U.S. 361, 372, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ).

TECO Mechanical Contractor, Inc. v. Com., 366 S.W.3d 386, 397 (Ky. 2012).

TECO, 366 S.W.3d at 397-98 (quoting Kentucky Commission on Human Rights v. Fraser, 625 S.W.2d 852, 854 (Ky. 1981)) (citing Butler v. United Cerebral Palsy of Northern Ky., Inc., 352 S.W.2d 203, 208 (Ky. 1961) ).

Fletcher v. Commonwealth, 163 S.W.3d 852, 863 (Ky. 2005) (quoting Myers v. U.S., 272 U.S. 52, 293, 47 S.Ct. 21, 71 L.Ed. 160 (1926) ).

Miller v. Covington Development Authority, 539 S.W.2d 1, 5 n.9 (Ky. 1976) (quoting Davis, Administrative Law Text, § 2.08 (3d ed. 1972)).

KRS 12.028(3) ("Any reorganization proposed under subsection ... (2) ... shall be set forth in a reorganization plan which shall be filed with the Legislative Research Commission."); KRS 12.028(4) ("When a proposed reorganization plan is submitted for review under subsection (2) ... the presiding co-chairman of the Legislative Research Commission shall determine which interim joint legislative committee has appropriate jurisdiction and shall refer the plan to such committee[.] ... The interim joint legislative committee ... shall review the plan to determine whether the plan can reasonably be expected to achieve greater economy, efficiency or improved administration in state government."); KRS 12.028(5) ("The Governor ... shall recommend legislation to the General Assembly [during the session immediately following the interim period in which the reorganization change was effectuated] to confirm the temporary reorganization plan. The subject matter of each executive order relating to reorganization shall be presented to the General Assembly in a separate bill.").

KRS 12.028(5) ("A temporary reorganization effected under subsections (2) to (4) of this section shall be terminated ninety (90) days after sine die adjournment of the next regular session of the General Assembly unless otherwise specified by the General Assembly.... If the General Assembly fails to enact a temporary reorganization plan, the Governor ... shall not effect the plan prior to the next succeeding session of the General Assembly.").

See Am. Beauty Homes Corp. v. Louisville & Jefferson Cty. Planning & Zoning Comm'n, 379 S.W.2d 450, 458 n.20 (Ky. 1964) ("It is very doubtful that characterizing the function of an administrative agency as quasi-judicial serves any purpose but to confuse. Though such an agency may adjudicate, it does not exercise judicial power and the term, instead of correlating the agency with the judiciary, may mean exactly the opposite.") (citations omitted).