Steve **BESHEAR** (in His Official Capacity as the Governor of the Commonwealth of Kentucky), et al., Appellants,

v.

**HAYDON BRIDGE COMPANY, INC., et al., Appellees.**

No. 2007–SC–000058–TG.

Supreme Court of Kentucky.

Jan. 21, 2010.

As Corrected March 17, 2010.

Christopher W. Brooker, Mark Stephen Pitt, Virginia Hamilton Snell, Wyatt, Tarrant & Combs, LLP, Louisville, KY, Counsel for Appellants.

Francis Lee Dickerson, Frankfort, KY, Counsel for Appellee Kentucky Workers' Compensation Funding Commission.

H. Edward O' Daniel, Jr., Springfield, KY, Mark David Guilfoyle, Dressman Benzinger LaVelle psc, Crestview Hills, KY, Counsel for Appellees Haydon Bridge Company, Inc.; Greater Louisville Auto Dealers Association; Kentucky Automobile Dealers Association; M & M Cartage Co., Inc.; Springfield Laundry and Dry Cleaning, Inc.; and Usher Transport, Inc.

Opinion of the Court by Justice SCOTT.

We granted transfer of this appeal and cross-appeal from the Court of Appeals, CR 74.02, to again address, as we did in part in *Commonwealth ex rel. Armstrong v. Collins*, 709 S.W.2d 437 (Ky.1986), the extent to which, in times of rising budget deficits, the Kentucky General Assembly may adopt a budget bill reducing, eliminating and/or transferring certain appropriated funds—effectively suspending, or temporarily modifying the effects of certain statutes or statutory schemes in view of the mandates and restriction of Sections 15 and 51 of the Kentucky Constitution. We also address whether, by such actions, the General Assembly may retroactively ratify prior invalid budgetary acts of a Governor. Other ancillary issues implicit in these questions will also be addressed.

The trial court upheld the questioned budgetary acts under Section 180 of the Kentucky Constitution but invalidated them under Section 51.

Having considered the record, briefs and arguments, we affirm the trial court's determination of the validity of the Legislative budget acts under Section 180 of the Kentucky Constitution, as well as its decision supported by *Armstrong*, 709 S.W.2d 437, that the transfer of funds *actually held* in agency accounts in which public funds and private contributions are commingled and cannot be differentiated, cannot be considered a valid suspension of the operation of a statute under Sections 15 and 51 of the Kentucky Constitution. However, we reverse the trial court's decision under Section 51 that the legislature could not, properly (1) suspend the nineteen million dollar ($19,000,000) annual appropriation to the Kentucky Workers' Compensation Funding Commission (KWCFC) and the Workers' Compensation Benefit Reserve Fund (BRF) to the extent the funds *had yet to he transferred* to them thus, there public funds were not commingled, or (2) mandate the continuance of the KWCFC employers' assessment rate of 11.5%.

### I. Legislative Background.

In the analysis of the budgetary acts at issue, it is helpful to understand the "Special Fund" legislative scheme that was affected. Originally known as the "Subsequent Injury Fund" when first created in 1946, the Fund's role was to compensate covered employees for pre-existing partial disabilities when they suffered subsequent work-related injuries. KRS 342.120 and 342.122 (1946). Its purpose was to encourage the employment of veterans with prior disabilities and to enhance compensation from the combined effects of work-related injuries and pre-existing conditions. "The enlarged or enhanced disability caused by reason of the [pre-existing condition] is paid by the special fund, with the cost distributed over Kentucky industry as a whole." UK Office of Continuing Legal Education, *Workers' Compensation in Kentucky*, § 1.41 (2d ed. 1996). The act imposed a tax on all insurance carriers insuring Kentucky employers against liability for injury or death suffered by their employees which was ultimately assessed against all insureds and self-insureds. KRS 342.122(2) (1946). As time passed,

"the 1960 General Assembly added provisions for additional assessments if the tax became insufficient. KRS 342.122(5) (1960)." *Thompson v. Kentucky Reinsurance Ass'n,* 710 S.W.2d 854, 856 (Ky.1986). The Fund's name was changed to the "Special Fund" in 1964. *Thompson,* 710 S.W.2d at 856.

In 1982, due to "reoccurring flaws" in funding, the system was again changed. *Id.* At that time, the General Assembly established the Kentucky Reinsurance Association (KRA) as a "non-profit, corporate entity to function as a reinsurer of all Special Fund liabilities." *Id.* As a result, the KRA collected "premiums from all subscribers—in advance—the amount of which [was] based on actuarial studies." *Id.*

The KRA was abolished in 1987 and replaced with the KWCFC, which uses its revenues to fund the current year's liabilities and costs for the Special Fund, with all funds "in excess of current liabilities of the Special Fund and budgeted expenditures," to be deposited in the Benefit Reserve Fund (BRF) "and invested in compliance with investment policies formulated by the funding commission [KWCFC]." KRS 342.122(1)(a) and 342.1229.[1]

During the early 1990s, the special fund's liabilities continued to grow, again overwhelming the funding mechanism dependant upon employer premiums. The General Assembly responded in December of 1996 when it enacted changes closing the Special Fund to any new claims for injuries suffered after December 12, 1996, KRS 342.120(2), and terminating all liability as of December 31, 2018. KRS 342.122(1)(b). In addition, it increased the funding component for the KWCFC by adding nineteen million dollars ($19,000,000) annually from the coal severance tax generated by coal operations, KRS 143.020, payable in four equal quarterly installments of four million, seven hundred fifty thousand dollars ($4,750,000). KRS 342.122(1)(c). The first payment began with the start of the 1998 fiscal year.

The General Assembly also established an annual assessment rate of 9% upon the amount of Workers' Compensation premiums receivable for the 1997 calendar year. KRS 342.122(1)(a). Thus, the KWCFC was directed, beginning in the 1998 calendar year and thereafter, to

> establish for the Special Fund an assessment rate to be assessed against all premium[s] received during that calendar year which, when added to the coal severance tax appropriated to the Special Fund in accordance with paragraph (c) of this section, shall produce enough revenue to amortize on a level basis the unfunded liability of the Special Fund as of September 1, preceding January 1, of each year, for the period remaining until December 31, 2018.

KRS 342.122(1)(b). As of July 1, 1997, the KWCFC was funded from three (3) sources: (1) assessments on premiums, (2)

---

1. The General Assembly also directed that the KWCFC shall "[h]old, administer, invest, and reinvest the funds collected pursuant to KRS 342.122 and its other funds separate and apart from all 'state funds' or 'public funds,' as defined in KRS Chapter 446." KRS 342.1223(2)(a). In addition, except as provided in KRS 342.829, KRS 342.1227, provides that KWCFC funds shall not:

 (1) Be loaned to the Commonwealth or any instrumentality or agency thereof;

 (2) Be subject to transfer to the Commonwealth or any agency or instrumentality thereof, except for purposes specifically authorized by this chapter;

 (3) Be expended for any other purpose than one authorized by this chapter.

 Moreover, the KWCFC was designated as a fiduciary "in exercising its power over the funds collected pursuant to KRS 342.122." KRS 342.1223(2)(b).

$4.75 million per quarter from the coal severance tax through the General Fund, and (3) income on investments earned by the BRF. *See* KRS 342.122.

## II. The Budgetary Acts Complained Of.

### A. The Annual $19,000,000 KWCFC and BRF Credits

In 1998 and 2000, then–Governor Paul Patton included the nineteen million dollar ($19,000,000) annual credits to the KWCFC in his budget recommendations for the 1998–2000 and the 2000–2002 biennial budgets.[2] The General Assembly accepted these recommendations and provided for the nineteen million dollar ($19,000,000) credits in the Budget Bills for these two-year budget cycles. Thus, quarterly payments in the amount of four million, seven hundred fifty thousand dollars ($4,750,000) each in coal severance tax revenues were credited to the BRF through the first quarter of the Commonwealth's fiscal year which began July 1, 2001.

On September 7, 2001, due to impending budget deficits, Governor Patton signed a general fund budget reduction order (02–01), countermanding the credits required by KRS 342.122(1)(c). Governor Patton's budget reduction order thus eliminated the mandatory credits *after* the first quarterly credit of four million, seven hundred fifty thousand dollars ($4,750,000) was made for the first quarter of the 2001–2002 fiscal year.[3] Thus, the remaining three forthcoming quarterly credits for fiscal year 2001–2002 (totaling $14,250,000) were stricken from the budget under the Gover-nor's plan. The authority to do so was asserted under part VI of the biennial budget of 2000–2002 which called for ratable reductions in government spending when budget cuts were necessary.

During the next regular session of the General Assembly in 2002, Governor Patton did not make a budget recommendation for the nineteen million dollars ($19,000,000) in annual credits in the 2002–2004 biennial budget. In turn, the General Assembly made history by failing to enact a biennial budget for the Executive and Judicial branches during this regular session. There being no Executive branch budget, the Governor elected to treat his Executive branch budget recommendations as the *de facto* budget for fiscal year 2002–2003, treating it as an "emergency spending plan."[4]

### B. The KWCFC Assessment Rate for Employer's Premiums.

KRS 342.122(1)(b) (2002) provided that the KWCFC:

shall, for calendar year 1998 and thereafter, establish for the special fund an assessment rate to be assessed against all premiums received during that calendar year which, when added to the coal severance tax appropriated to the special fund in accordance with paragraph (c) of this section, shall produce enough revenue to amortize on a level basis the unfunded liability of the special fund as of September 1 preceding January 1 of each year, for the period remaining until December 31, 2018. The interest rate to be used in this calculation shall reflect

---

2. The Governor is required to make this recommendation pursuant to KRS 48.112(1)-(2).

3. Governor Patton did not cancel the first quarter payment, thus, it is assumed it had already been made as of his budget reduction order of September 7, 2001.

4. "On June 27, 2002, the Chief Justice promulgated an order implementing a spending plan to cover the expenses of the judicial department from and after July 1, 2002." *Fletcher v. Commonwealth*, 163 S.W.3d 852, 857 n. 1 (Ky.2005).

the funding commission's investment experience to date and the current investment policies of the commission. This assessment shall be imposed upon the amount of workers' compensation premiums received by every insurance carrier writing workers' compensation insurance in the Commonwealth, by every group of self-insurers operating under the provisions of KRS 342.350(4), and against the premium, as defined in KRS 342.0011, of every employer carrying his own risk. On October 16, 2001—post 9/11—the KWCFC Board met to decide the assessment rate on premiums for 2002, which was 9% as originally established by KRS 342.122(1)(a) beginning January 1, 1997. The Board increased the premium assessment rate from 9% to 11.5%. The increase in the assessment rate increased Kentucky employers' assessments in the approximate amount of nineteen million, eight hundred thousand dollars ($19,800,000) for the 2003 fiscal year.

During the 2003 regular session of the General Assembly, the General Assembly belatedly enacted a 2002–2004 biennial budget. This budget also cancelled the appropriation of nineteen million dollars ($19,000,000) annually to the KWCFC and BRF by language in the bill stating, "notwithstanding KRS 342.122(1)(c)," [5] and mandated the continuance of the employers' assessment rate of 11.5%—the same as previously set by the KWCFC—for the

biennium, stating, "notwithstanding KRS 342.122(1)(b)." 2003 Ky. Acts ch. 156, § 337.[6] In effect, the General Assembly adopted Governor Patton's emergency spending plan.

## C. The Other Transfers.

In this budget, the General Assembly also transferred from the BRF funds one million, seven hundred thousand dollars ($1,700,000) to finance a portion of the Mines and Minerals budget and an additional five million dollars ($5,000,000) back to the general fund. 2003 Ky. Acts, ch. 156, §§ 337, 394. In the previous 2000–2002 budget, it had also transferred one million, six hundred forty-eight thousand, and five hundred dollars ($1,648,500) to finance a portion of the Mines and Minerals budget. 2000 Ky. Acts ch. 549, § 1757.

## D. The 2004 Restoration.

During the 2004 regular session of the General Assembly, it again dead-locked and failed to pass an executive department budget bill for the 2004–2006 biennium. However, then–Governor Fletcher implemented a Public Services Continuation Plan in lieu of an executive budget by virtue of executive order 2004–650. This plan reinstituted the four million, seven hundred fifty thousand dollar ($4,750,000) quarterly credits from coal severance funds to the BRF for the benefit of the

---

5. KRS 342.122(1)(c) provides:
 In addition to the assessment imposed in paragraph (a) or (b) of this subsection, and notwithstanding and prior to the transfer of funds to the Local Government Economic Assistance Program under KRS 42.450 to 42.495, the Kentucky Department of Revenue shall credit nineteen million dollars ($19,000,000) in coal severance tax revenues levied under KRS 143.020 to the benefit reserve fund within the Kentucky Workers' Compensation Funding Commission each year beginning with fiscal year 1998

and all fiscal years thereafter. The annual transfer of nineteen million dollars ($19,-000,000) shall occur in four (4) equal quarterly payments. *These transfers shall occur not later than the last day of each quarter of each calendar year* and shall consist of four (4) equal payments of four million, seven hundred fifty thousand dollars ($4,750,000). (emphasis added).

6. These two (2) legislative suspensions appear beside each other in the 2003 budget bill. 2003 Ky. Acts ch. 156, § 337.

Workers' Compensation Program. Then, on October 2, 2004, the KWCFC Board reduced the assessment rate back to 9%. Predictably, on March 8, 2005, during the course of its thirty-day (30) legislative session, the General Assembly again enacted a belated executive branch budget for the 2004–2006 biennium and, as it had done in its 2003 session, "ratified all executive department actions taken pursuant to the Public Services Continuation Plan, *nunc pro tunc." Fletcher*, 163 S.W.3d at 859.

### III. Sections 15 and 51 of the Kentucky Constitution.

Section 15 of the Kentucky Constitution provides that, "[n]o power to suspend laws shall be exercised unless by the General Assembly or its authority."

Section 51 of the Kentucky Constitution provides:

No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title, and no law shall be revised, amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revised, amended, extended or conferred, shall be reenacted and published at length.

This Section prescribes three things: firstly, that any act of the Legislative Branch shall relate to one subject (the one subject rule), which shall, secondly, be expressed in the title of the Act (the title or notice requirement), and thirdly, that no existing law shall be revised, amended or its provisions conferred or extended by referring to its title only, but rather when

such action is intended, the act must be reenacted and published at length (the publication requirement).

### IV. The Parties and the Action.

The Appellees/Cross–Appellants consist of various employers subject to the Kentucky Workers' Compensation Act (namely: Haydon Bridge Company, Inc.; Greater Louisville Auto Dealers Association; Kentucky Automobile Dealer Association; M & M Cartage Co., Inc.; Springfield Laundry & Dry Cleaners, Inc.; and Usher Transport, Inc.) and are hereinafter referred to as Appellees.[7] Appellants/Cross–Appellees herein are Governor Steven L. Beshear and State Budget Director Mary E. Lassiter, both in their official capacities on behalf of the Commonwealth of Kentucky, and are hereinafter referred to as Appellants or the Commonwealth.[8]

Appellees filed their Petition for Declaration of Rights and Injunctive Relief against Appellants in the Franklin Circuit Court on December 4, 2003. Following completion of initial discovery, Appellees moved for partial summary judgment, contending, as pertinent here, that the budgetary actions violated Sections 15, 51 and 180 of the Kentucky Constitution. The Appellants filed counter motions for summary judgment.[9]

Thereafter, on June 30, 2006, the Franklin Circuit Court entered its Opinion and Order denying Appellants' motion for summary judgment and granting Appellees' motion for partial summary judgment. In

---

**7.** The KWCFC was originally an Appellant/Cross–Appellee, but is now an Appellee/Cross–Appellant.

**8.** Governor Beshear has been substituted for former Governor Paul Patton, who was an original respondent in the original declaratory judgment action in December 2003.

**9.** The KWCFC did not file a counter motion for summary judgment, but rather responded that the Appellee's motion for partial summary judgment was premature.

so doing, it noted the issues related to gubernatorial powers had already been addressed and resolved in another case (referring to *Fletcher*, 163 S.W.3d 852). On the other pertinent issues, it upheld the budgetary actions as *not* in violation of Section 180 of the Kentucky Constitution, but found them violative of, and unconstitutional under, Section 51's "publication" requirement. This appeal followed.

## V. Contentions of the parties.

Appellants urge us to reverse the trial court's ruling regarding the "publication" requirement of Section 51 of the Kentucky Constitution for reasons that the budgetary actions were suspensions for the two-year biennial budget permissible under Sections 15 and 51 of the Kentucky Constitution and on further grounds that the amounts transferred—the nineteen million dollars ($19,000,000) annual credit,[10] the two separate amounts transferred to fund portions of the Mines and Minerals budget in the 2000–2002 and 2002–2004 biennial budget, as well as the five million dollars ($5,000,000) transferred back to the general fund in the 2002–2004 biennial budget— were taken, or diverted, from "public" funds, rather than "private funds" or "trust" funds. The Appellants further argue that the budgetary actions did not violate the "title" (or notice) requirement of Section 51, but that the trial court was correct in its determination that these actions did not violate Section 180 of the Kentucky Constitution.

Appellees argue that the budgetary actions violated both the "title" and "publication" requirements of Section 51 of the Kentucky Constitution and that, as the funds held by the BRF are "private"—not "public"—and are held in "trust" for the

beneficiaries of the Kentucky Workers' Compensation program, the General Assembly had no authority to transfer these amounts to the general fund or to the budget of Mines and Minerals or mandate the continuance of the employers' assessment rate of 11.5%. They further contend that such transfers violate Section 180 of the Kentucky Constitution and are implicitly prohibited by KRS 48.316, a secondary argument to the suspension and publication arguments under Section 51. They also argue that the General Assembly had no authority to retroactively ratify Governor Patton's emergency spending orders suspending the nineteen million dollars ($19,000,000) in coal severance funds due the KWCFC and BRF for reasons that said actions were void *ab initio* under this Court's decision in *Fletcher*, 163 S.W.3d 852.

## VI. Analysis

### A. Legislative Ratification of the Governor's Budgetary Actions.

■ Appellees contend that the General Assembly may not ratify budgetary actions of the Governor which were void *ab initio*. We choose to address this issue first because of its propensity to render the other issues moot. This issue was not addressed by the trial court, which merely noted that "issues relating to gubernatorial powers have been addressed and resolved in another case," referring of course to *Fletcher*.

As mentioned, in the fall of 2001, Governor Patton issued a budget reduction plan inconsistent with the appropriations directed in KRS 342.122(1)(c).[11] This action oc-

---

**10.** Including the three (3) quarterly installments of, four million seven hundred and fifty thousand dollars ($4,750,000) each, diverted beginning September 7, 2001.

**11.** As previously noted, KRS 342.122(1)(c)

curred as a budget reduction measure in respect to the 2000–2002 biennial budget. The parties disagree as to whether or not this action of Governor Patton was in compliance with KRS 48.130(5) (2000).[12]

Subsequently, when Governor Patton presented his budget request to the 2002 General Assembly for the 2002–2004 biennial budget, Appellees assert he violated KRS 48.112 by failing to make the required budget recommendation for the nineteen million dollar ($19,000,000) credit to the BRF.[13] After the General Assembly failed to enact an Executive branch budget, the Governor converted his budget recommendation into an emergency spending plan, again without including the nineteen million dollar ($19,000,000) credit to the BRF. Ultimately, however, when the General Assembly finally passed its biennial budget for 2002–2004 on March 5, 2003, it adopted the Governor's actions, to wit:

> Notwithstanding KRS 48.130 and 48.600, the General Assembly confirms, adopts, and enacts the revised General Fund appropriations levels for the budget units of the Executive Branch contained in General Fund Budget Reduction Order 02–01, General Fund Budget Reduction Order 02–02, General Fund Budget Reduction Order 02–03, General Fund Budget Reduction Order 02–04, and confirms and enacts the advances, transfers, and lapses to the General Fund of non–General Fund moneys identified in General Fund Budget Reduction Order 02–01, General Fund Budget Reduction Order 02–02, General Fund Budget Reduction Order 02–03, and General Fund Budget Reduction Order 02–04.

H.B. 269, 2003 Leg. Reg., Sess. (Ky. 2003).

As previously noted, the General Assembly also adopted other measures to balance the budget. It reclaimed approximately five million dollars ($5,000,000) from the BRF for the General Fund and transferred one million, seven hundred thousand dollars ($1,700,000) from the BRF to the Department of Mines and Minerals and mandated the KWCFC continue the employers' assessment rate of 11.5%. In so doing, the General Assembly stated that it was only reclaiming public money originally transferred from the General Fund and leaving untouched private premium assessments: "Funds lapsed in Part V include no employer benefit premiums or liability

---

provides, in part, that:

> [T]he Kentucky Department of Revenue shall credit nineteen million dollars ($19,000,000) in coal severance tax revenues levied under KRS 143.020 to the benefit reserve fund [BRF] within the Kentucky Workers' Compensation Funding Commission [KWCFC] each year beginning with fiscal year 1998 and all fiscal years thereafter. The annual transfer of nineteen million dollars ($19,000,000) shall occur in four (4) equal quarterly payments. These transfers shall occur not later than the last day of each quarter of each calendar year and shall consist of four (4) equal payments of four million, seven hundred fifty thousand dollars ($4,750,000).

12. KRS 48.130(5) (2000) provided in part that, "[i]n the event of an actual or projected deficit in tax receipts of five percent (5%) or less, the Governor, the Chief Justice, and Legislative Research Commission . . . shall implement budget reductions for their respective branches consistent with the provisions of the enacted branch budget bills."

13. In summary, KRS 48.112(1) provides,

> [t]he provisions of any other law notwithstanding, the Governor shall include in the budget recommendation for the executive branch and in the draft branch budget bill for the executive branch submitted to each even-numbered-year regular session of the General Assembly . . . recommendations for appropriations as provided in KRS 342.122($l$)(c) [$19,000,000] to be made by the General Assembly to the benefit reserve [BRF] fund within the Kentucky Workers' Compensation Funding Commission established by KRS Chapter 342.

payments and are the recapture of fiscal year 2001–2002 General fund transfers to the Benefit Reserve Fund [BRF]." *Id.* The question urged for our decision then, is whether the General Assembly can ratify actions of the Governor, which he did not, and could not legally perform.

We have previously held that a Governor does not have the authority under the Constitution of Kentucky to suspend the operation of any statute and that such actions are unconstitutional and invalid *ab initio.* *Fletcher,* 163 S.W.3d at 872 ("A fortiori, the suspension of any statutes by the Governor's Public Services Continuation Plan was unconstitutional and invalid *ab initio* ") (emphasis in original). However, budget reductions—as opposed to total suspensions—made by the respective branches of government consistent with the provisions of the enacted branch budget bills passed by the General Assembly would be presumably appropriate. *See Legislative Research Com'n v. Brown,* 664 S.W.2d 907, 926 (Ky.1984); *see also Gering v. Brown,* 396 S.W.2d 332 (Ky.1965); *Lovelace v. Commonwealth,* 285 Ky. 326, 147 S.W.2d 1029 (1941).[14] "[I]n the absence of a proper delegation of authority by one department to another, or a specific exception articulated by the Constitution, itself, Section 28 [of the Kentucky Constitution] has erected a 'high wall,' which precludes the exercise by one department of a power vested solely in either of the others." *Id.* at 863 (internal citation omitted).

Moreover, KRS 48.130(5) (2000) was limited to budget shortfalls of "five percent (5%) or less." As Appellees assert that Governor Patton's 2001 suspension occurred during a "severe budget shortfall" and we are not otherwise advised of record of the exactness of this assertion, we will assume for purposes of this analysis that the Governor's actions in 2001 were outside the parameters of "the provisions of the enacted branch budget bills." KRS 48.130(5) (2000). The question presented then is the question noted—but left unanswered—in *Fletcher. Fletcher,* 163 S.W.3d at 872 ("However, neither the parties representing state employees nor the Board of Trustees of the Kentucky Employees Retirement System presently seek remedial relief from the suspensions [rather] admitting that those issues were resolved during the 2004 extraordinary session of the General Assembly.") (footnote omitted).

■ We did, however, address this question in *Baker v. Fletcher,* 204 S.W.3d 589 (Ky.2006). *Baker* involved a question within the same tenure as to whether the General Assembly could retroactively suspend a statute (previously suspended by Governor Patton as a part of his executive spending plan) providing all employees of the Commonwealth with an annual incremental increase in their salaries of not less than 5%. In *Baker,* both Governor Patton, in his executive spending plan, and the legislature (retroactively), allocated an annual salary increase of only 2.7%, rather than the 5% statutorily mandated. We held in *Baker* that:

> The parties concede that the General Assembly has the authority to adjust the salaries of its employees at any time. Included within that authority is the power to adjust annual increments. Therefore, even if the Appellants are correct that they had a right to the statutory five percent increment, the General Assembly had authority to adjust their pay to meet its fiscal objectives. The intent of the General Assem-

---

**14.** Appellees assert that part VI of the 2000–2002 biennial budget called for radical reductions in government spending rather than a total suspension of the nineteen million dollars ($19,000,000) to be paid to the BRF annually pursuant to KRS 342.122(1)(c).

bly was to appropriate money to fund an identical increment for all employees. To interpret the budget bill otherwise would be to ignore the plain meaning of the budget bill, the clear intent of the General Assembly, and our precedents. *Id.* at 598. Plainly then, "the General Assembly may *retroactively* suspend statutes ... provided that the legislature clearly manifests its intent to do so." *Id.* at 592 (emphasis in original).

As in *Baker*, there is no question but that the General Assembly intended for its belated budget act to apply retroactively. *Id.* at 597 ("Thus, we conclude that legislative intent was to suspend [the statute] and make it retroactive to the beginning of the biennium."). It said so by adopting the Governor's budget orders. And in *Baker*, we found the General Assembly's retroactive action valid. *Id.* at 598. ("Therefore, even if the Appellants are correct that they had a right to the statutory five percent increment, the General Assembly had authority to adjust their pay to meet its fiscal objectives."). Thus, under *Baker*, we necessarily found the legislative action valid, even though retroactive. Thus, to the extent the General Assembly's actions here are valid and constitutional, they constitute a valid adoption and ratification of the prior invalid acts of the Governor. *Id.*

### B. Section 51 of the Kentucky Constitution.

#### 1. The Title or Notice Requirement.

 The title or notice requirement of "Section 51 of the [Kentucky] Constitution provides that no law enacted by the General Assembly shall relate to more than one subject, *and that subject shall be expressed*

*in the title.*" [15] *Bowman v. Hamlett,* 159 Ky. 184, 166 S.W. 1008, 1009 (1914) (emphasis added). The "title or notice requirement," that the subject shall be *expressed* in the title, is separate and apart from the "one subject" rule which precedes it.

> Prior to Section 51's adoption, it was competent for the Legislature to legislate upon a multiplicity of unrelated subjects which were neither remotely germane to, or in any wise connected with, the one or ones named in the title ... [and] *[t]o circumvent such deceptive practices resulting in deceitful, selfish, and other baleful consequences, the provision was inserted in the Constitution.*

*Armstrong,* 709 S.W.2d at 444 (emphasis in original) (*quoting Talbott v. Laffoon,* 257 Ky. 773, 79 S.W.2d 244 (1935)). Its purpose then, was "[t]o prevent surprise or fraud upon the Legislature by means of provisions in bills, of which the titles gave no intimation, and which might, therefore, be overlooked and carelessly or unintentionally adopted." *Bowman* 166 S.W. at 1009.

 Under the title, or notice section of Section 51, "[w]here the title adequately expresses a general subject, any provision in the Act that is germane to or reasonably embraced within that general subject must be considered to be within the scope of the notice of subject given by the title." *Board of Trustees of Policemen's and Firemen's Retirement Fund of City of Paducah v. City of Paducah,* 333 S.W.2d 515, 520 (Ky.1960). Thus, "[t]he title need only furnish general notification of the general subject in the act. If the title furnishes a 'clue' to the act's contents, it passes constitutional muster." *Armstrong,* 709 S.W.2d

---

**15.** Section 51 first appeared in this abbreviated form as § 37 of Article II of the 1850 Kentucky Constitution. It reached its full breadth (with the "publication" language) in the 1891 Constitution.

at 443 (citing Laffoon, 79 S.W.2d at 244 (1935)).

Thus,

having in mind the purpose of this provision and the evil against which it is aimed, before any act of the General Assembly should be nullified by this court, upon the ground that the subject of the act is not expressed in the title by reason of a variance between the title and the body of the act, it should be made to appear, and the court should be satisfied, that the variance complained of is such as to bring it within the range of the evils sought to be guarded against . . . .

Bowman, 166 S.W. at 1009–10.

### a. The Precedents

In Armstrong, we weighed (1) a reduction in officers' salaries, (2) the transfer of funds from various trust and agency accounts to the general fund of the Commonwealth, (3) the opening of access to other accounts for use by the Transportation Cabinet, (4) the renting—as opposed to loaning—of school text books to students, including an extension to six (6) years for the minimum use, as well as, (5) new requirements for certification in order to receive funding for jail medical service contracts—against the "title" or "notice" requirement of Section 51. Interestingly, the Budget Bill which carried the enactments weighed in Armstrong was titled "AN ACT relating to appropriations for the operation, maintenance, support, and functioning of the government of the Commonwealth of Kentucky and its various officers, cabinets, departments, boards, commissions, institutions, subdivisions, agencies, and other state supported activities." Armstrong, 709 S.W.2d at 444.

In measuring the level of "notice" required, we noted "[c]ertainly, the title does not tell the reader that—in the voluminous act—the General Assembly has authorized the reduction of salary increases and the transfer of trust and agency funds." Id. Yet, we noted that, "under the case law cited . . . all that is necessary is that the act give a 'clue' as to its content and that the act be not deceitful, selfish or result in 'baleful' consequences." Id. We also noted "[t]he provisions thereof that suspend or modify the expenditure of monies . . . are clearly appropriations, in the broad sense." Id. And "[t]he fact that the title tells the reader that the act is an appropriation for the funding of state government clearly alerts one to the fact that the act deals with 'appropriations' including possible changes." Id. Moreover, "[w]hether one agrees with this infringement on the traditional use of 'free' textbooks, one cannot challenge the General Assembly's right to make such a policy decision. The same logic applies to extending the use of books for a period of six years." Id. at 448. "We believe therefore that not only is the action of the General Assembly . . . valid as a suspension or modification of existing statutes, we also believe that, there is, in effect, no real conflict." Id.

As to the new restrictions on acquiring certification for jail funding for medical service contracts, we noted:

It is an altogether too familiar litany that the premise of this provision is to react to the financial crunch of the state and that such directive is only temporary. It is also too familiar to say that this attempt of the General Assembly to regulate even temporarily, the procurement by medical services contracts—in an economical manner—is clearly a subject of an appropriation.

Id.

Grayson County Bd. of Educ. v. Casey, 157 S.W.3d 201, 207–208 (Ky.2005), on the other hand, is illustrative of legislative changes in a biennial budget bill which did

not meet the "title" or "notice" level required by Section 51. In *Casey*, the appropriations title of the bill at issue was the same as that considered in *Armstrong*. *Casey* at 208. The budget bill also contained the provision: "Notwithstanding any provision of the Kentucky Revised Statutes to the contrary, to the extent that any governmental agency purchases *motor vehicle liability insurance*, sovereign immunity shall be waived to the extent of the insurance coverage." *Id.* at 207–08 (emphasis added). In holding this provision of the biennial budget bill unconstitutional under Section 51, we noted that it was "not germane in any way to 'appropriations providing financing for the operations, maintenance, support, and functioning' of any governmental agency. It did not authorize the purchase of automobile liability insurance and did not require the Commonwealth to pay any judgment, much less appropriate any state funds for either purpose." *Id.* at 209.

### b. The 2002–2004 Budget Act.

■ The title of the biennial budget bill under review herein for the 2002–2004 budget, reads: "AN ACT relating to appropriations and revenue measures providing financing for the operations, maintenance, support and functioning of the government of the Commonwealth of Kentucky and its various officers, cabinets, departments, boards, commissions, institutions, subdivisions, agencies and other state-supported activities." H.B. 269, 2003 Leg., Reg. Sess. (Ky. 2003). The only difference between this title and the titles considered in *Armstrong* and *Casey* is the additional wording of "revenue measures." In this instance, the budgetary acts complained of transferred amounts between the BRF funds and the general fund and the budget of the department of Mines and Minerals as aforementioned. In addition, the General Assembly diverted to the general fund the nineteen million dollar ($19,000,000) annual appropriation to the KWCFC and BRF and mandated the continuation of the employers' assessment rate as previously established by the KWCFC at 11.5% for the budgetary period.

Clearly, the budgetary acts of suspending, transferring and allocating funds to and between the various departments of government are acts of appropriation of which due notice was given by the budgetary title.

### c. Effect on Collateral Statutory Schemes.

The Appellees argue, however, that the budgetary title must give notice of all the resulting or collateral effects of the budgetary changes, arguing that each annual denial of funding increases the liability of Kentucky employers that pay the "special fund" debt, amends KRS 342.122(1)(b), setting the special fund assessment rate, overrides the legislative finding of KRS 342.1241(1) that black lung costs have placed a substantial burden on all employers of the Commonwealth through the "special fund" assessment previously imposed on all employers, redirects the allocation of coal severance tax revenues under KRS 42.4582 and KRS 42.4585 (which requires the credits to the BRF to be made "off the top") and skirts budgetary definitions in KRS 42.409(5) and KRS 42.409(12)(a). However, we have previously stated:

> Section 51 of the Constitution requires that the title shall express the subject legislated upon; but there is no requirement that the title of an act shall also undertake to state what former acts are thereby repealed. Such a requirement would not only be unreasonable; it would be impracticable; and it would lay upon the Legislature the duty of weigh-

ing the legal effect of prior legislation and determining just what legislation is repealed by the act proposed.

*Bowman,* 166 S.W. at 1010; *City of Paducah,* 333 S.W.2d at 521 ("Section 51 of the Constitution does not require that statutes which are amended or repealed merely by implication, or by the superseding effect of the later enactment, be republished and set forth at length."). As previously noted, "[t]he title need only furnish general notification of the general subject in the act." *Armstrong,* 709 S.W.2d at 443. Clearly, in this instance it does.

### d. The Mandated Continuance of the KWCFC Employers' Assessment Rate.

Appellees also assert that the General Assembly's mandated continuance of the KWCFC's assessment rate of 11.5% for the biennium was in reality, a surreptitious tax increase and thus, a fraud on Kentucky employers in violation of the notice requirement of Section 51.[16,17] To support its argument that the mandated continuance of the assessment of 11.5% was a "tax"

increase, it points out that the increase of the assessment from 9% to 11.5% by the KWCFC on October 16, 2001, following Governor Patton's suspension of the nineteen million dollar ($19,000,000) severance tax credit to the BRF Fund on September 7, 2001, resulted in an increase of nineteen million, eight hundred thousand dollars ($19,800,000) in additional Kentucky employers' assessments in the 2003 fiscal year,[18] and following Governor Fletcher's reinstitution of the nineteen million dollar ($19,000,000) coal severance tax credit to the BRF, the KWCFC, on October 22, 2004, reduced the assessment rate back to 9%.

The parties' arguments aside, there is a difference between taxes and assessments.

In a broad sense, taxes undoubtedly include assessments, and the right to impose assessments has its foundation in the taxing power of the government; and yet, in practice and as generally understood, there is a broad distinction between the two terms. 'Taxes,' as the term is generally used, are public bur-

---

**16.** Appellants object to consideration of any issue asserting violation of Section 51's "one subject" rule on the grounds that Appellees conceded via their reply brief in the trial court that, i.e., "Section 51 has two distinct parts: (1) single subject title rule, and (2) enactment and publication at length. Petitioners [Appellees] do not contend that either the 2000–2002 or the 2002–2004 biennial budget violated the single subject title rule." Appellants thus assert that such consideration—assuming the issue is now raised by Appellees—violates the doctrine of *Fischer v. Fischer,* 197 S.W.3d 98, 102 (Ky.2006) ("[A] question not raised or adjudicated in the court below cannot be considered when raised for the first time in this court."). However, *Fischer* also noted that "[i]f the summary judgment is sustainable on any basis, it must be affirmed." *Id.* at 103. Yet, appellate courts have been adept at applying the old maxim to the effect that "appellants [cross-appellants here] will not be permitted to feed one can of worms to the trial judge and

another to the appellate court." *Kennedy v. Commonwealth,* 544 S.W.2d 219, 222 (Ky. 1976). Be that as it may, Appellees do not argue a violation of the "one subject" rule, they specifically argue "lack of germaneness" to the title, or notice requirement and violation of Section 51's "publication" requirement.

**17.** Appellees also assert in a one sentence statement, without argument or explanation, that such conduct violates "due process" and Section 242 of the Kentucky Constitution. However, we are not inclined to review such arguments without citation to authority or explanation. CR 76.12(4)(c)(v). That being said, we recently addressed "retroactivity" and "due process" in *Miller v. Johnson Controls, Inc.,* 296 S.W.3d 392 (Ky.2009).

**18.** Appellants, on the other hand, argue the increase in the rate by the KWCFC was compelled by the market collapse post 9/11.

dens imposed generally upon the inhabitants of the whole state, or upon some civil division thereof, for governmental purposes, without reference to peculiar benefits to particular individuals or property. 'Assessments,' have reference to . impositions for improvements and which are specially beneficial to particular individuals or property, and which are imposed in proportion to the particular benefits supposed to be conferred. They are justified only because the improvements conferred special benefits and are just only when they are divided and proportioned to such benefits.

*Black's Law Dictionary* 1629 (rev'd 4th ed. 1968). We recognized this distinction in *Thompson*, 710 S.W.2d at 857–858, wherein we acknowledged:

For years prior to 1982, the Special Fund (and its predecessor) were funded by *taxes* and *assessments*. As we stated, this procedure was flawed and the funding was continually inadequate and untimely. Clearly, a bold, new approach was needed. The KRA resulted. Its sole corporate purpose is to fund all claims and liabilities of the Special Fund. Its sole income is from premiums charged its subscribers-insurance carriers, self-insurance groups, and self-insured employees. The amount of the premiums is to be determined-actuarially-to be that amount of dollars necessary to fund the Special Fund—*whatever the amount.* If the premiums and premium increases are insufficient to meet those needs, the amount of premiums is pro forma increased.

. . . .

... [The KRA] was created for one purpose and its funding is achieved without tax dollars, without public money. The method of operation is to collect premiums-in advance of liabilities-to invest these funds, so that much of the liability can be met by investment income.

(emphasis in original). This distinction notwithstanding, both taxes and assessments are appropriately referred to as revenue measures and the title of the budgetary act complained of clearly gives notice that they relate "to appropriations *and revenue measures* providing financing for the operations, maintenance, support and functioning of the government of the Commonwealth of Kentucky" and its various entities. H.B. 269, 2003 Leg. Reg. Sess. (Ky. 2003).

That being said, we do not overlook the "appropriations" scheme within which these budgetary actions occurred. The budget referenced that "[n]otwithstanding KRS 342.122(1)(c), no General Fund Appropriation is provided to the [KWCFC] in fiscal year 2002–2003 and fiscal year 2003–2004." H.B. 269, 2003 Leg. Reg. Sess. (Ky. 2003). Moreover, the increase in the employers' assessment rate to 11.5%—was made by the KWCFC more than a year before the General Assembly mandated its continuance. And as per the Workers' Compensation statutory scheme, KRS 342.122(1)(b) required the KWCFC keep an assessment rate which maintained parity with the amortization level commanded therein. Given that the statutory assessment rate selected by the KWCFC met the statutory demands of KRS 342.122(1)(b), one cannot say that the General Assembly enacted a surreptitious tax.

To the contrary, the statutory scheme worked as it should have given the emergency withdrawal of the nineteen million dollars ($19,000,000) in credits contemplated by KRS 342.122(1)(c). Thus, the mandated continuance of the assessment rate merely insured its continuance by the KWCFC and as demanded by KRS 342.122(1)(b)—for the period of time necessary to protect the appropriations

scheme contained in the budget bill. Moreover, in *Armstrong,* we upheld an analogous revenue measure allowing schools to rent—rather than loan—textbooks to students as germane to "appropriations for the operation, maintenance, support, and functioning of the government of the Commonwealth of Kentucky." *Armstrong,* 709 S.W.2d at 444. Thus, it was also plainly germane to "appropriations."

Appellees' reliance on *McGuffey v. Hall,* 557 S.W.2d 401, 406–07 (Ky.1977), is misplaced. *McGuffey* held only that significant permanent amendments to the "physicians, osteopaths and podiatrists" statutes in a stand-alone bill were "not sufficiently related to malpractice claims or insurance [as disclosed in the title so as] to satisfy Const. § 51." *Id.* at 407.

In this instance, the act's title referenced "appropriations and revenue measures" and under either, it clearly avoided the evil against which the title section of Section 51 is directed. *Cf., Armstrong,* 709 S.W.2d at 444 ("No person could claim to have been mislead by the title. . . ."). Thus, we find that the budgetary acts complained of complied with the title or notice section of Section 51 of the Kentucky Constitution as they were germane to the title.

### 2. The Reenactment or Publication Requirement.

■ Appellees contend that the trial court was correct in finding that the biennial budget acts at issue violated the "publication" requirement of Section 51—i.e., that all the statutes affected, directly or collaterally, were not republished in the budget act with their actual or implied changes textually set out. The trial court held, given the effect of the budget acts on the expansive statutory scheme of the Kentucky Workers' Compensation Act, that "[f]ew, if any, members of the General

Assembly could have a full notion and understanding of the implications and ramifications in removing nineteen million dollars ($19,000,000) in coal severance funds from the BRF with the simple phrase 'notwithstanding KRS 342.122.' " Upon such a belief, the Franklin Circuit Court held that "the funds transfer challenged herein in the 2000–2002 and 2002–2004 Budget Bills violate[d] Section 51 of the Kentucky Constitution." (Slip Opinion at 11).

### a. The Difference Between the Publication Section and the Title Section.

In this regard, the publication requirement of Section 51 of the Kentucky Constitution provides, in relevant part: "no law shall be revised, amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revised, amended, extended or conferred shall be reenacted and published at length."

■ The difference between the "title" (or notice) requirement of Section 51 and the "publication" section is that the "title" section applies to *all* legislative acts of the legislature, including "suspensions," where the "reenactment or publication" requirement applies only to legislation that revises, amends, extends or confers. *See Armstrong,* 709 S.W.2d at 445. ("As stated, its application is limited by its own wording to amendment, revision, extension or conferring of existing statutes.").

While some may contest the notion that the members of the General Assembly would be unaware that removing nineteen million dollars ($19,000,000) per year from the Kentucky Workers' Compensation Fund would affect the statutory funding scheme in addition to KRS 342.122(1)(c)— which in fact, requires the funding—the point of the "publication" requirement of Section 51 is that "no law shall be revised,

amended, or the provision thereof extended or conferred *by reference to its title only.*" (emphasis added). If it is a revision, amendment, extension or conference, it must be published. The question then becomes whether the budget acts complained of constitute revisions or amendments.[19]

In *Armstrong,* we noted the General Assembly had "not repealed or amended the . . . statutes, it [had] simply temporarily suspended them, as it clearly [had] the power to do." *Id.* at 445–46. Thus, publication was *not* required. Moreover, we found it "beyond cavil that the General Assembly can suspend the operation of statutes" pursuant to Section 15 of the Constitution of Kentucky. *Id.* at 442. "No matter how one slices it, the General Assembly is permitted through the reduction or elimination of an appropriation, to effectively eliminate the efficacy of existing statutes, subject only to the finding of a financial emergency and further subject to the time limitation of the budgetary period." [20] *Id.* at 441.

"If a challenged statutory enactment falls within the proscribed activities, as opposed to merely being suspensory in nature, it is violative of [the 'publication' section] of Section 51. If it is, however, merely a suspension or modification, it is not violative thereof." *Armstrong,* 709 S.W.2d at 445. "Such a requirement [otherwise] would not only be unreasonable; it would be impracticable; and it would lay upon the Legislature the duty of weighing

the legal effect of prior legislation and determining just what legislation is repealed by the act proposed." *Bowman,* 166 S.W. at 1010.

A suspension must, by its nature, be a temporary measure and in *Armstrong,* we found that a budgetary reduction in the biennial budget, which expired at the end of the biennium, was a temporary measure. *Armstrong,* 709 S.W.2d at 445. There, we recognized that the General Assembly had "not repealed or amended the existing . . . statutes, [but had] simply temporarily suspended them." *Id.* at 445–46. Here, like *Armstrong,* the acts of taking, or shifting budgetary funds expired—in three (3) instances with the particular transfers—and as to the transfer of the severance tax funds and the mandated continuance of the assessment rate, at the end of the 2002–2004 biennial budget.[21] Thus, they were temporary.

Furthermore,

[t]he General Assembly is mandated to operate the financial offices of the Commonwealth under a balanced budget. If the revenues become inadequate, the General Assembly must be empowered to use adequate devices to balance the budget. Provisions in the budget document which effectively suspend and modify existing statutes which carry financial implication certainly are consistent with those duties and responsibilities.

---

19. No party argues they constitute an extension or conference.

20. The court's reference in *Armstrong* to "financial emergency" reflected its awareness, at the time, of KRS 446.085 (S.B. 294), which required a "financial emergency" before the General Assembly could suspend an appropriation statute in a budget bill. However, the General Assembly repealed KRS 446.085 in

1994. No one disputes that the acts at issue herein were undertaken pursuant to a perceived financial emergency.

21. As previously noted, the nineteen million dollar ($19,000,000) funding for the Workers' Compensation scheme was restored by Governor Fletcher following the expiration of the 2002–2004 biennial budget.

*Armstrong,* 709 S.W.2d at 443. And "[w]e have emphasized the obvious, *viz,* that the General Assembly may ... *suspend or modify* existing statutes in a budget bill." *Id.* (emphasis in original).

### b. To Be Valid, a Suspension Must Be Within the Authority of the General Assembly.

In *Armstrong,* we analyzed the authority for the several acts of suspension considered in order to complete the determination as to whether a budgetary action was properly a suspension. *Armstrong,* 709 S.W.2d at 446 ("Not only does the budget document provide for the transfers, but they are authorized by statutes."). We then held:

> [t]he transfers of funds which relate to appropriations of private contributions *cannot be termed suspensions or modifications* of the operation of the statutes. Because the General Assembly has no authority to transfer private funds to the general fund, the transfer of money from agencies in which public funds and private employee contributions are commingled, and cannot be differentiated, is unconstitutional.

*Armstrong,* 709 S.W.2d at 446–47 (emphasis added); *see also Thompson,* 710 S.W.2d at 857 ("[T]he funds premiums assessed by the [KWCFC] are clearly *private* funds as opposed to public and are therefore not subject to control by the General Assembly.") (emphasis added). Thus, to be a valid "suspension," the act must not only be temporary, it must also be within the authority of the General Assembly to do.

Having determined that the General Assembly has the authority to temporarily suspend or modify the operation of exist-

ing statutes in its budget bills, *Armstrong* sets forth the sequence of our considerations. *Armstrong,* 709 S.W.2d at 440. First, we must determine that the General Assembly has acted within its statutory powers. *Id.* ("The General Assembly, has by this statute, drawn a line between its power in the budget bill to suspend or modify existing statutes, as opposed to repealing or amending existing statutes."). Secondly, if it is acting within its constitutional and statutory authority, it must be determined whether its budgetary actions comply with the "title" (notice) section of Section 51 of the Kentucky Constitution. *Id.*[22] Thirdly,

> [i]f the answer to the second inquiry is in the affirmative we must, finally, examine each contested 'modification or suspension' contained in the budget bill to determine if such actually constitutes a repeal or amendment, or if each is truly a modification or suspension within the purview of [any applicable statutory restrictions on its powers] and of the re-enactment and publication section of Kentucky Constitution Section 51.

*Id.* at 440–41. Thus, *Armstrong* recognizes that the General Assembly may limit or deprive itself of its constitutional powers under Section 51.

Moreover, the court noted in *Armstrong,* that:

> It is clear from the plain language of the statute [S.B. 294/KRS 446.085] that in Section (1) the General Assembly deprives itself of the legal authority to *repeal or amend,* through the device of a budget bill, any other existing law appearing in the Kentucky Revised Statutes. However, in Section (2), the General Assembly gives itself the power to

---

**22.** *Armstrong* did not note the "one subject" restriction of Section 51 as a requirement separate from the "title or notice" section. However, they are separate requirements. The "one subject rule" limits the subject matter, while the "title" section deals with notice and germaneness.

*suspend or modify the operation* of any statute, *but only if the financial condition of state government so requires.* The duration of such suspension is limited to the duration of the budget.

The General Assembly has, by this statute, drawn a line between its power in the budget bill to suspend or modify existing statutes, as opposed to repealing or amending existing statutes. It cannot repeal or amend, but it can suspend or modify existing statutes through the provisions of a budget bill.

709 S.W.2d at 440.[23] (emphasis added).

▬ Thus, we must also address Appellees' argument that the General Assembly lacked the authority to suspend funds for KRS Chapter 342 by virtue of KRS 48.316.[24] KRS 48.316 provides:

To the extent that the provisions of a budget bill are in conflict with any provisions of KRS Chapters 12, 42, 56, 152, 177, or 341, the provisions of those chapters are hereby suspended or modified. Such suspension or modification shall not extend beyond the duration of the budget bill.

This statute obviously does not reference KRS Chapter 342, suggesting the General Assembly may have intended to restrict its authority to suspend statutes in KRS Chapter 342. However, KRS 48.316 was enacted in 1984 along with KRS 48.315. KRS 48.315 provides:

(1) The General Assembly may provide in a budget bill for the transfer to the general fund for the purpose of the general fund all or part of the agency funds, special funds, or other funds established under the provisions of KRS ... *342.122;* 342.480, etc.

(2) The transfer of moneys from the agency funds, special funds, or other funds to the general fund provided for in subsection (1) of this section shall be for the period of time specified in the budget bill.

(3) Any provisions of any statute in conflict with the provisions of subsections (1) and (2) of this section are hereby suspended or modified. Any suspension or modification shall not extend beyond the duration of the budget bill.

(emphasis added). Through KRS 48.315, the General Assembly *clearly* intended to provide for the modification or suspension during the budgetary period of the funds enumerated in KRS 342.122 as was done here.

▬ Yet, *Armstrong* held KRS 48.315 unconstitutional, in part, noting that, "[b]ecause the General Assembly has no authority to transfer *private funds* to the general fund, the transfer of money from agencies in which public funds and private employee contributions are commingled,

---

**23.** The statutory authority considered by the court in *Armstrong* and S.B. 294 (KRS 446.085), was later repealed as previously noted in footnote 18. It provided as follows:
(1) Nothing in a budget bill adopted by the General Assembly shall be construed to affect a repeal or amend in the Kentucky Revised Statutes, and if any repeal or amendment appears to be effective in any of the Kentucky's Revised Statutes, it shall be disregarded, shall be null and void, and the law as it existed prior to the effected date of the budget bill shall be given full force and effect.

(2) Notwithstanding the provisions of § (1) of this section, the General Assembly may provide in the budget bill for the suspension or modification of the operation of a statute if the General Assembly finds that the financial condition of state government requires such suspension or modification. Such suspension or modification shall not extend beyond the duration of the budget bill.

**24.** KRS 48.316 was enacted at the same time as S.B. 294 (KRS 446.085), previously discussed. KRS 48.316 has not been repealed.

and cannot be differentiated, is unconstitutional." *Armstrong,* 709 S.W.2d at 446 (emphasis added). However, if public funds are *not commingled,* or can be *differentiated* from private funds, *Armstrong* is not applicable. We thus recognize KRS 48.315 cannot apply to private funds, or public funds which are commingled and incapable of differentiating. *Id.* But, we must also recognize that to the extent it affects only public funds which are not commingled, or if so, are capable of differentiation, it is valid legislation.

Moreover, in 1990, the General Assembly enacted KRS 48.310(2), which provides, "[a] budget bill may contain language which exempts the budget bill or any appropriation or the use thereof from the operation of a statute for the effective period of the budget bill." Again, however, there is nothing in the language of KRS 48.310(2) which overrides the restriction in *Armstrong* against the invasion of private agency funds or public funds commingled with private funds and incapable of differentiation. Thus, KRS 48.310(2) is also restricted by *Armstrong. Id.* at 446. In noting that, "[Appellees] argue persuasively that under KRS 48.316, no authority exists to amend or modify Chapter 342 in the Budget Bill," the trial court apparently disregarded the limited validity of KRS 48.315, as well as KRS 48.310(2).

 Appellees, however, now assert that KRS 48.310(2) should be disregarded because KRS 48.316 is the more "specific" (*citing City of Bowling Green v. Board of Ed. of Bowling Green,* 443 S.W.2d 243, 247 (Ky.1969)) (for the proposition that specific legislation prevails over general legislation). However, it is also, "an elementary rule of statutory interpretation that whenever in the statutes on any particular subject there are apparent conflicts which

cannot be reconciled, the *later* statute controls." *Butcher v. Adams,* 310 Ky. 205, 220 S.W.2d 398, 400 (1949) (emphasis added). This rule is based upon the theory of an implicit repeal of any conflict in the earlier statute. *Id.*

 Yet, "[t]he cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature." *Travelers Indem. Co. v. Reker,* 100 S.W.3d 756, 763 (Ky.2003). And "[in] the face of statutory silence with respect to legislative intent, 'we look for guidance to outside sources, such as legislative history.' " *Id.* at 764 (*citing White v. Check Holders, Inc.,* 996 S.W.2d 496, 497 (Ky.1999)). Moreover, "[i]n construing a statute ... a court may look to a prior act from which it was taken, or one of which it is a revision, or one relating to the same subject matter, in order to arrive at the intent and purpose of the Legislature." *City of Owensboro v. Noffsinger,* 280 S.W.2d 517, 519 (Ky.1955).

Looking at the contrasting statutes and considering that KRS 48.315 and 48.316 were enacted together in 1984, and that KRS 48.310(2) was added in 1990, it seems clear that the Legislature intended to retain the statutory authority "to suspend" provisions of KRS 342.122.[25] KRS 48.315 appears to have been set out separately from KRS 48.316 in recognition that the funds affected were "agency funds, special funds, or other funds established under the [noted] provisions." *Cf.,* KRS 48.315(1). Thus, although KRS 48.310(2) and 48.315 are both confined by *Armstrong,* they do overcome any perceived limitation of KRS 48.316 when dealing with "public" funds, even if commingled—but only so long as such "public" funds can be *differentiated* from any "private" funds.

Having reviewed the pertinent legislative framework, we are convinced the Gen-

---

**25.** KRS 48.315, however, limits itself to transfers "to the general fund." KRS 48.315(2).

eral Assembly intended to reserve to itself, via KRS 48.310(2) and KRS 48.315, the legislative right to suspend the applications of KRS Chapter 342 to public funds—at least to the extent said funds were not commingled with private agency funds, or if so, to the extent they could be differentiated therefrom.

### c. Agency and Trust funds.

Appellees also assert that the KWCFC and BRF funds are held in trust, separate and apart from public funds, and therefore may not be transferred to the General Fund based on this Court's holding in *Armstrong.* See *Armstrong,* 709 S.W.2d at 447. As previously said, however, *Armstrong* only prohibits the invasion of private agency funds, or public funds commingled with private funds and incapable of differentiation.

They also assert that transfer of these funds is prohibited by KRS 342.1227, which prohibits the funds from being transferred "to the Commonwealth, or any agency or instrumentality thereof," or expended, "for any other purpose than one authorized by [KRS Chapter 342]." KRS 342.1227(2),(3). Having determined that the General Assembly may, in the instance mentioned, divert "public funds" to other uses pursuant to its "suspension" power, we consider again whether, under the circumstances peculiar to this case, it may take back what it has already given by invading agency funds.

The funds to which KRS 342.1227 applies, are those "under the jurisdiction of the [KWCFC]." KRS 342.1227. Noting that the KWCFC is to "[h]old, administer, invest, and reinvest the funds *collected* pursuant to KRS 342.122 and its other funds[,] separate and apart from all 'state funds' or 'public funds,'" KRS 342.1223(2)(a), and that it acts, "as a fiduciary ... in exercising its power over the funds *collected* pursuant to KRS 342.122," KRS 342.1223(2)(b), and that, "[a]ll funds in excess of current liabilities of the special fund and budgeted expenditures *shall be deposited* in the [BRF] *and invested* in compliance with the investment policies formulated by the [KWCFC]," KRS 342.1229, we are convinced that the term "jurisdiction," as used by the legislature in KRS 342.1227, means "in the possession of." (emphasis added). We also note the amounts to be credited to the KWCFC and BRF from the severance tax revenues are to be *transferred* quarterly. KRS 342.122(1)(c). Thus, KRS 342.1227 prohibits funds in "in the possession of" the KWCFC (or the BRF) from being transferred or loaned to the Commonwealth, or expended for other purposes. It does not prohibit the diversion of such funds *prior* to their receipt by the KWCFC or BRF.

Thus, the amounts taken from *the possession* of the KWCFC or BRF and transferred to the general fund and Mines and Minerals appear to be in violation of KRS 342.1227(2), unless otherwise authorized by KRS 48.310(2) or KRS 48.315. That, in turn, depends on how KRS 48.310(2) and KRS 48.315 are limited under these facts by *Armstrong.* Budgetary actions cannot be termed proper "suspensions" per Section 15 of the Kentucky Constitution, unless authorized by other budgetary authority.

*Armstrong* addressed several conflicts between then-existing statutes and the budgetary acts of the General Assembly. *Armstrong,* 709 S.W.2d at 445–448. In each instance, except for the transfer dealing with agency funds "in which public funds and private employee contributions [were] commingled, and [could not] be differentiated," we *upheld* the budgetary acts under the recognition that then KRS 446.085 (S.B. 294) authorized the suspension or modification and overrode the *con-*

*flicting statute. Armstrong,* 709 S.W.2d at 448. ("As we have said, previously, the 'conflict' is authorized by S.B. 294.").

Moreover, in *Armstrong,* we grappled with the problem of differentiation. *Id.* at 446. However, we offered no standard by which to accomplish this task. We did attempt, however, to identify the funds within which the problem would be expected.[26]

Here, Appellants assert they can mathematically trace the public funds contributed to the KWCFC and BRF, as well as, the monies expended therefrom. They assert the difference identifies—or differentiates—the remaining public funds, which they assert are well in excess of the amounts transferred. Mathematical calculations, however, cannot identify the actual source of every dollar that would be transferred, as there were no directories in the budgets which funded the KWCFC and BRF disclosing whether the nineteen million dollars ($19,000,000) in public contributions would be spent currently for authorized programs during the biennium or would be invested to pay future liabilities, or apportioned between current and future needs, or in any other way differentiated from the employers' assessments and investment income.

In short, year-end balances cannot be separated into categories called "public money" and "private agency funds." Moreover, *Armstrong* dictates that "the General Assembly has *no* authority to transfer private funds to the general fund." *Id.* at 446 (emphasis added). Thus, it would not tolerate *any* transfer that would or might include private agency funds. There is simply no authority to transfer private agency funds such as

these, to other funds in our budget. *Armstrong* may set a high standard, but it is one that can be met—but not by mathematical projections under these circumstances.

Thus, in this instance, we are compelled to conclude the funds in question—those actually taken from the hands of the KWCFC and BRF—have not been sufficiently differentiated and the transfers therefore are improper. Consequently, KRS 48.310(2) and KRS 48.315 cannot apply to authorize the transfers of funds actually held by KWCFC and BRF and said transfers violate KRS 342.1227.

We thus hold that the General Assembly, in its budgetary actions for the 2000–2002 and 2002–2004 biennial budgets, had the authority under KRS 48.310(2) and KRS 48.315 and Sections 15 and 51 of the Kentucky Constitution to "suspend" appropriations of the nineteen million dollar ($19,000,000) annual funding of the KWCFC and BRF, including the three quarterly payments diverted following the first quarter of the 2001 fiscal year. The amounts, however, taken directly from the funds and transferred to Mines and Minerals on two occasions, as well as the five million dollars ($5,000,000) transferred back to the General Fund from the KWCFC and BRF funds in the 2002–2004 biennial budget were not authorized by KRS 48.310(2) or KRS 48.315, and were in violation of KRS 342.1227(2)-(3) and as such, were improper suspensions under Section 15, and as "amendments," rather than "suspensions," were subject to the "publication" requirement of Section 51 of the Kentucky Constitution. There having been no publication, the transfers were, and are, invalid.

---

**26.** Diversions from the Kentucky Employees Retirement System, County Employees Retirement System, State Police Retirement System, and Teachers' Retirement System fall within this category, as do Workers' Compensation and Workers' Claims Special Fund. *Armstrong,* 709 S.W.2d at 446–47.

#### d. Section 180 of the Kentucky Constitution

Appellees also assert that the diversion of the nineteen million dollars ($19,000,000) annually in coal severance tax receipts from the BRF back to the General Fund violates Section 180 of the Kentucky Constitution. Section 180 provides, in part: "Every act enacted by the General Assembly ... levying a tax, shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose." Ky. Const. § 180.

Appellees, therefore assert, pursuant to KRS 342.122(1)(c), that the nineteen million dollars ($19,000,000) annually is "dedicated" to funding the BRF.[27] This argument, however, ignores the central premise of Section 180, which, again, states "[e]very act enacted by the General Assembly ... shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose."

To determine the purpose for which the tax was levied, we must look to the act levying the tax—not to the one receiving its benefit. In this case, KRS 143.090(4) provides that, "[a]ll [coal severance] tax levied by KRS 143.020 collected in excess of the amount required to be deposited to the transportation fund (road fund) or transferred to the Office of Energy Policy shall be deposited by the Department of Revenue to the credit of the general fund." Thus, KRS 143.090(4) does not, itself, dedicate coal severance tax revenue to the KWCFC or BRF.

Therefore, the transfer of the nineteen million dollars ($19,000,000) in annual credits[28] diverted from the KWCFC and the BRF to the General Fund was not in violation of Section 180 of the Kentucky Constitution.

### VII. Conclusion

Based upon the foregoing, we affirm the Franklin Circuit Court to the extent it held that the annual transfer of the nineteen million dollars ($19,000,000) from the KWCFC and the BRF to the general fund does not violate Section 180 of the Kentucky Constitution and that the five million dollars ($5,000,000) transferred to the General Fund in the 2002–2004 biennial budget, as well as the two separate amounts transferred from the KWCFC and BRF to fund a portion of the Mines and Minerals budget in the 2000–2002 and 2002–2004 biennial budgets, are invalid transfers, for reasons the funds were commingled, and cannot be differentiated. *Armstrong*, 709 S.W.2d at 446.

Moreover, these commingled funds were in the actual possession of the KWCFC and BRF and thus, such transfers violate KRS 342.1227(2)-(3). Being commingled funds incapable of differentiation, KRS 48.310(2)-(3) and 48.315 cannot apply to override KRS 342.1227(2). Thus, the statutory transfers could not be proper "suspensions" under Section 15 of the Kentucky Constitution, and thus, they constituted amendments required to be republished under Section 51 of the Kentucky Constitution. They were not republished, and are therefore invalid.

---

**27.** KRS 342.122(1)(c), as we know it today, took effect twenty-six years (26) after the coal severance tax was implemented. *See* KRS 143.020 (1972); KRS 342.122(1)(C) ("[b]eginning with fiscal year 1998 ....").

**28.** This also includes the three quarterly amounts taken in fiscal year 2002.

The transfer, or diversion of funds which had not yet been received by the KWCFC and BRF, were not commingled agency funds and thus, under the "jurisdiction" of the KWCFC or BRF per KRS 342.1227(2), and thus were authorized by KRS 48.310(2) and KRS 48.315 and were proper "suspensions" under Sections 15 and 51 of the Kentucky Constitution. In this regard, we reverse the opinion of the Franklin Circuit Court.

Moreover, we do not find that the General Assembly's mandate that the employers' assessment rate of 11.5% for the 2002–2004 biennium be continued was the enactment of a tax. The employers' assessment rate of 11.5%, having been previously set by the KWCFC pursuant to KRS 342.122(1)(b), the mandate of continuation was not a tax, or in fact, an actual assessment. Moreover, it was plainly germane to both the "appropriations" measures, as well as, the "revenue" measures. Thus, to the extent that the Franklin Circuit Court characterized this mandated rate freeze as a "tax by any other name," subject to the "publication" provision of Section 51, it is also reversed. This mandated rate freeze was a proper suspension under Section 15 of the Kentucky Constitution and thus valid under Section 51 of the Kentucky Constitution.

Having reversed in part and affirmed in part the opinion of the Franklin Circuit Court, this matter is remanded to the Franklin Circuit Court for such further proceedings as are necessary and consistent with this opinion.

CUNNINGHAM, NOBLE, SCHRODER and VENTERS, JJ., concur. MINTON, C.J., and ABRAMSON, J., concur in result only.